# UNITED STATES *v.* TEXAS.

## NO. 13, ORIGINAL.

Argued March 28, 1950.—Decided June 5, 1950.

*Solicitor General Perlman* argued the cause for the United States. With him on the brief were *Attorney General McGrath, Assistant Attorney General Vanech, Arnold Raum, Oscar H. Davis, Robert E. Mulroney, Robert M. Vaughan, Frederick W. Smith* and *George S. Swarth.*

*Price Daniel,* Attorney General of Texas, and *J. Chrys Dougherty,* Assistant Attorney General, argued the cause for the defendant. With them on the brief were *Jesse P. Luton, Jr., K. Bert Watson, Dow Heard, Walton S. Roberts, Claude C. McMillan, Fidencio M. Guerra,* and *Mary K. Wall,* Assistant Attorneys General, and *Roscoe Pound* and *Joseph Walter Bingham.*

Mr. Justice Douglas delivered the opinion of the Court.

This suit, like its companion, *United States* v. *Louisiana, ante,* p. 699, decided this day, invokes our original jurisdiction under Art. III, § 2, Cl. 2 of the Constitution and puts into issue the conflicting claims of the parties to oil and other products under the bed of the ocean below low-water mark off the shores of Texas.

The complaint alleges that the United States was and is

> "the owner in fee simple of, or possessed of paramount rights in, and full dominion and power over, the lands, minerals and other things underlying the Gulf of Mexico, lying seaward of the ordinary low-water mark on the coast of Texas and outside of the inland waters, extending seaward to the outer edge of the continental shelf and bounded on the east and southwest, respectively, by the eastern boundary of the State of Texas and the boundary between the United States and Mexico."

The complaint is in other material respects identical with that filed against Louisiana. The prayer is for a decree adjudging and declaring the rights of the United States as against Texas in the above-described area, enjoining Texas and all persons claiming under it from continuing to trespass upon the area in violation of the rights of the United States, and requiring Texas to account to the United States for all money derived by it from the area subsequent to June 23, 1947.

Texas opposed the motion for leave to file the complaint on the grounds that the Attorney General was not authorized to bring the suit and that the suit, if brought, should be instituted in a District Court. And Texas, like Louisiana, moved to dismiss on the ground that since Texas had not consented to be sued, the Court

had no original jurisdiction of the suit. After argument, we granted the motion for leave to file the complaint. 337 U. S. 902. Texas then moved to dismiss the complaint on the ground that the suit did not come within the original jurisdiction of the Court. She also moved for a more definite statement or for a bill of particulars and for an extension of time to answer. The United States then moved for judgment. These various motions were denied and Texas was granted thirty days to file an answer. 338 U. S. 806.

Texas in her answer, as later amended, renews her objection that this case is not one of which the Court has original jurisdiction; denies that the United States is or ever has been the owner of the lands, minerals, etc., underlying the Gulf of Mexico within the disputed area; denies that the United States is or ever has been possessed of paramount rights in or full dominion over the lands, minerals, etc., underlying the Gulf of Mexico within said area except the paramount power to control, improve, and regulate navigation which under the Commerce Clause the United States has over lands beneath all navigable waters and except the same dominion and paramount power which the United States has over uplands within the United States, whether privately or state owned; denies that these or any other paramount powers or rights of the United States include ownership or the right to take or develop or authorize the taking or developing of oil or other minerals in the area in dispute without compensation to Texas; denies that any paramount powers or rights of the United States include the right to control or to prevent the taking or developing of these minerals by Texas or her lessees except when necessary in the exercise of the paramount federal powers, as recognized by Texas, and when duly authorized by appropriate action of the Congress; admits that she claims rights, title, and interests in said lands, minerals, etc., and says that her rights include ownership and the right

to take, use, lease, and develop these properties; admits that she has leased some of the lands in the area and received royalties from the lessees but denies that the United States is entitled to any of them; and denies that she has no title to or interest in any of the lands in the disputed area.

As an affirmative defense, Texas asserts that as an independent nation the Republic of Texas had open, adverse, and exclusive possession and exercised jurisdiction and control over the land, minerals, etc., underlying that part of the Gulf of Mexico within her boundaries established at three marine leagues from shore by her First Congress and acquiesced in by the United States and other major nations; that when Texas was annexed to the United States the claim and rights of Texas to this land, minerals, etc., were recognized and preserved in Texas; that Texas continued as a State to hold open, adverse and exclusive possession, jurisdiction and control of these lands, minerals, etc., without dispute, challenge or objection by the United States; that the United States has recognized and acquiesced in this claim and these rights; that Texas under the doctrine of prescription has established such title, ownership and sovereign rights in the area as preclude the granting of the relief prayed.

As a second affirmative defense, Texas alleges that there was an agreement between the United States and the Republic of Texas that upon annexation Texas would not cede to the United States but would retain all of the lands, minerals, etc., underlying that part of the Gulf of Mexico within the original boundaries of the Republic.

As a third affirmative defense, Texas asserts that the United States acknowledged and confirmed the three-league boundary of Texas in the Gulf of Mexico as declared, established, and maintained by the Republic of Texas and as retained by Texas under the annexation agreement.

Texas then moved for an order to take depositions of specified aged persons respecting the existence and extent of knowledge and use of subsoil minerals within the disputed area prior to and since the annexation of Texas, and the uses to which Texas has devoted parts of the area as bearing on her alleged prescriptive rights. Texas also moved for the appointment of a special master to take evidence and report to the Court.

The United States opposed these motions and in turn moved for judgment asserting that the defenses tendered by Texas were insufficient in law and that no issue of fact had been raised which could not be resolved by judicial notice. We set the case down for argument on that motion.

We are told that the considerations which give the Federal Government paramount rights in, and full dominion and power over, the marginal sea off the shores of California and Louisiana (see *United States* v. *California,* 332 U. S. 19; *United States* v. *Louisiana, supra*) should be equally controlling when we come to the marginal sea off the shores of Texas. It is argued that the national interests, national responsibilities, and national concerns which are the basis of the paramount rights of the National Government in one case would seem to be equally applicable in the other.

But there is a difference in this case which, Texas says, requires a different result. That difference is largely in the preadmission history of Texas.

The sum of the argument is that prior to annexation Texas had both *dominium* (ownership or proprietary rights) and *imperium* (governmental powers of regulation and control) as respects the lands, minerals and other products underlying the marginal sea. In the case of California we found that she, like the original thirteen colonies, never had *dominium* over that area. The first claim to the marginal sea was asserted by the National Government. We held that protection and control of it

were indeed a function of national external sovereignty. 332 U. S. 31–34. The status of Texas, it is said, is different: Texas, when she came into the Union, retained the *dominium* over the marginal sea which she had previously acquired and transferred to the National Government only her powers of sovereignty—her *imperium*—over the marginal sea.

This argument leads into several chapters of Texas history.

The Republic of Texas was proclaimed by a convention on March 2, 1836.[1] The United States[2] and other nations[3] formally recognized it. The Congress of Texas on December 19, 1836, passed an act defining the boundaries of the Republic.[4] The southern boundary was described as follows: "beginning at the mouth of the Sabine river, and running west along the Gulf of Mexico three leagues from land, to the mouth of the Rio Grande."[5] Texas was admitted to the Union in 1845 "on an equal footing with the original States in all respects whatever."[6] Texas claims that during the period from 1836 to 1845 she had brought this marginal belt into her territory and subjected it to her domestic law which recognized ownership in minerals under coastal waters. This the United States contests. Texas also claims that under international law, as it had evolved by the 1840's, the Republic of Texas as a sovereign nation became the owner of the bed and

---

[1] 1 Laws, Rep. of Texas, p. 6.

[2] See the Resolution passed by the Senate March 1, 1837 (Cong. Globe, 24th Cong., 2d Sess., p. 270), the appropriation of a salary for a diplomatic agent to Texas (5 Stat. 170), and the confirmation of a charge d'affaires to the Republic in 1837. 5 Exec. Journ. 17.

[3] See 2 Gammel's Laws of Texas 655, 880, 886, 889, 905 for recognition by France, Great Britain, and The Netherlands.

[4] 1 Laws, Rep. of Texas, p. 133.

[5] The traditional three-mile maritime belt is one marine league or three marine miles in width. One marine league is 3.45 English statute miles.

[6] See Joint Resolution approved December 29, 1845, 9 Stat. 108.

sub-soil of the marginal sea *vis-à-vis* other nations. Texas claims that the Republic of Texas acquired during that period the same interest in its marginal sea as the United States acquired in the marginal sea off California when it purchased from Mexico in 1848 the territory from which California was later formed. This the United States contests.

The Joint Resolution annexing Texas[7] provided in part:

> "Said State, when admitted into the Union, after ceding to the United States, *all public edifices, fortifications, barracks, ports and harbors, navy and navy-yards, docks, magazines, arms, armaments, and all other property and means pertaining to the public defence* belonging to said Republic of Texas, shall retain all the public funds, debts, taxes, and dues of every kind, which may belong to or be due and owing said republic; and shall also retain *all the vacant and unappropriated lands lying within its limits,* to be applied to the payment of the debts and liabilities of said Republic of Texas, and the residue of said lands, after discharging said debts and liabilities, to be disposed of as said State may direct; but in no event are said debts and liabilities to become a charge upon the Government of the United States." (Italics added.)

The United States contends that the inclusion of fortifications, barracks, ports and harbors, navy and navy-yards, and docks in the cession clause of the Resolution demonstrates an intent to convey all interests of the Republic in the marginal sea, since most of these properties lie side by side with, and shade into, the marginal sea. It stresses the phrase in the Resolution "other property and means pertaining to the public defence." It

---

[7] Joint Resolution approved March 1, 1845, 5 Stat. 797.

argues that possession by the United States in the lands underlying the marginal sea is a defense necessity. Texas maintains that the construction of the Resolution both by the United States and Texas has been restricted to properties which the Republic actually used at the time in the public defense.

The United States contends that the "vacant and unappropriated lands" which by the Resolution were retained by Texas do not include the marginal belt. It argues that the purpose of the clause, the circumstances of its inclusion, and the meaning of the words in Texas and federal usage give them a more restricted meaning. Texas replies that since the United States refused to assume the liabilities of the Republic, it was to have no claim to the assets of the Republic except the defense properties expressly ceded.

In the *California* case, neither party suggested the necessity for the introduction of evidence. 332 U. S. 24. But Texas makes an earnest plea to be heard on the facts as they bear on the circumstances of her history which, she says, sets her apart from the other States on this issue.

The Court in original actions, passing as it does on controversies between sovereigns which involve issues of high public importance, has always been liberal in allowing full development of the facts. *United States* v. *Texas*, 162 U. S. 1; *Kansas* v. *Colorado*, 185 U. S. 125, 144, 145, 147; *Oklahoma* v. *Texas*, 253 U. S. 465, 471. If there were a dispute as to the meaning of documents and the answer was to be found in diplomatic correspondence, contemporary construction, usage, international law and the like, introduction of evidence and a full hearing would be essential.

We conclude, however, that no such hearing is required in this case. We are of the view that the "equal footing" clause of the Joint Resolution admitting Texas to the Union disposes of the present phase of the controversy.

The "equal footing" clause has long been held to refer to political rights and to sovereignty. See *Stearns* v. *Minnesota,* 179 U. S. 223, 245. It does not, of course, include economic stature or standing. There has never been equality among the States in that sense. Some States when they entered the Union had within their boundaries tracts of land belonging to the Federal Government; others were sovereigns of their soil. Some had special agreements with the Federal Government governing property within their borders. See *Stearns* v. *Minnesota, supra,* pp. 243–245. Area, location, geology, and latitude have created great diversity in the economic aspects of the several States. The requirement of equal footing was designed not to wipe out those diversities but to create parity as respects political standing and sovereignty.

Yet the "equal footing" clause has long been held to have a direct effect on certain property rights. Thus the question early arose in controversies between the Federal Government and the States as to the ownership of the shores of navigable waters and the soils under them. It was consistently held that to deny to the States, admitted subsequent to the formation of the Union, ownership of this property would deny them admission on an equal footing with the original States, since the original States did not grant these properties to the United States but reserved them to themselves. See *Pollard's Lessee* v. *Hagan,* 3 How. 212, 228–229; *Mumford* v. *Wardwell,* 6 Wall. 423, 436; *Weber* v. *Harbor Comm'rs,* 18 Wall. 57, 65–66; *Knight* v. *U. S. Land Assn.,* 142 U. S. 161, 183; *Shively* v. *Bowlby,* 152 U. S. 1, 26; *United States* v. *Mission Rock Co.,* 189 U. S. 391, 404. The theory of these decisions was aptly summarized by Mr. Justice Stone speaking for the Court in *United States* v. *Oregon,* 295 U. S. 1, 14 as follows: [8]

---

[8] The same idea was expressed somewhat differently by Mr. Justice Field in *Weber* v. *Harbor Comm'rs, supra,* pp. 65–66 as follows: "Although the title to the soil under the tidewaters of the bay was

"Dominion over navigable waters and property in the soil under them are so identified with the sovereign power of government that a presumption against their separation from sovereignty must be indulged, in construing either grants by the sovereign of the lands to be held in private ownership or transfer of sovereignty itself. See *Massachusetts* v. *New York,* 271 U. S. 65, 89. For that reason, upon the admission of a State to the Union, the title of the United States to lands underlying navigable waters within the States passes to it, as incident to the transfer to the State of local sovereignty, and is subject only to the paramount power of the United States to control such waters for purposes of navigation in interstate and foreign commerce."

The "equal footing" clause, we hold, works the same way in the converse situation presented by this case. It negatives any implied, special limitation of any of the paramount powers of the United States in favor of a State. Texas prior to her admission was a Republic. We assume that as a Republic she had not only full sovereignty over the marginal sea but ownership of it, of the land underlying it, and of all the riches which it held. In other words, we assume that it then had the *dominium* and *imperium* in and over this belt which the United States now claims. When Texas came into the Union, she ceased

---

acquired by the United States by cession from Mexico, equally with the title to the upland, they held it only in trust for the future State. Upon the admission of California into the Union upon equal footing with the original States, absolute property in, and dominion and sovereignty over, all soils under the tidewaters within her limits passed to the State, with the consequent right to dispose of the title to any part of said soils in such manner as she might deem proper, subject only to the paramount right of navigation over the waters, so far as such navigation might be required by the necessities of commerce with foreign nations or among the several States, the regulation of which was vested in the General government."

to be an independent nation. She then became a sister State on an "equal footing" with all the other States. That act concededly entailed a relinquishment of some of her sovereignty. The United States then took her place as respects foreign commerce, the waging of war, the making of treaties, defense of the shores, and the like. In external affairs the United States became the sole and exclusive spokesman for the Nation. We hold that as an incident to the transfer of that sovereignty any claim that Texas may have had to the marginal sea was relinquished to the United States.

We stated the reasons for this in *United States* v. *California, supra,* p. 35, as follows:

"The three-mile rule is but a recognition of the necessity that a government next to the sea must be able to protect itself from dangers incident to its location. It must have powers of dominion and regulation in the interest of its revenues, its health, and the security of its people from wars waged on or too near its coasts. And insofar as the nation asserts its rights under international law, whatever of value may be discovered in the seas next to its shores and within its protective belt, will most naturally be appropriated for its use. But whatever any nation does in the open sea, which detracts from its common usefulness to nations, or which another nation may charge detracts from it, is a question for consideration among nations as such, and not their separate governmental units. What this Government does, or even what the states do, anywhere in the ocean, is a subject upon which the nation may enter into and assume treaty or similar international obligations. See *United States* v. *Belmont,* 301 U. S. 324, 331–332. The very oil about which the state and nation here contend might well become the subject of international dispute and settlement."

And so although *dominium* and *imperium* are normally separable and separate,[9] this is an instance where property interests are so subordinated to the rights of sovereignty as to follow sovereignty.

It is said that there is no necessity for it—that the sovereignty of the sea can be complete and unimpaired no matter if Texas owns the oil underlying it. Yet, as pointed out in *United States* v. *California,* once low-water mark is passed the international domain is reached. Property rights must then be so subordinated to political rights as in substance to coalesce and unite in the national sovereign. Today the controversy is over oil. Tomorrow it may be over some other substance or mineral or perhaps the bed of the ocean itself. If the property, whatever it may be, lies seaward of low-water mark, its use, disposition, management, and control involve national interests and national responsibilities. That is the source of national rights in it. Such is the rationale of the *California* decision, which we have applied to Louisiana's case. The same result must be reached here if "equal footing" with the various States is to be achieved. Unless any claim or title which the Republic of Texas had to the marginal sea is subordinated to this full paramount power of the United States on admission, there is or may be in practical effect a subtraction in favor of Texas from the national sovereignty of the United States. Yet neither the original thirteen States (*United States* v. *California, supra,* pp. 31–32) nor California nor Louisiana enjoys such an advantage. The "equal footing" clause prevents extension of the sovereignty of a State into a domain of political and sovereign power of the United States from which the other States

---

[9] See the statement of Mr. Justice Field (then Chief Justice of the Supreme Court of California) in *Moore* v. *Smaw,* 17 Cal. 199, 218–219.

have been excluded, just as it prevents a contraction of sovereignty (*Pollard's Lessee* v. *Hagan, supra*) which would produce inequality among the States. For equality of States means that they are not "less or greater, or different in dignity or power." See *Coyle* v. *Smith,* 221 U. S. 559, 566. There is no need to take evidence to establish that meaning of "equal footing."

Texas in 1941 sought to extend its boundary to a line in the Gulf of Mexico twenty-four marine miles beyond the three-mile limit and asserted ownership of the bed within that area.[10] And in 1947 she put the extended boundary to the outer edge of the continental shelf.[11] The irrelevancy of these acts to the issue before us has been adequately demonstrated in *United States* v. *Louisiana.* The other contentions of Texas need not be detailed. They have been foreclosed by *United States* v. *California* and *United States* v. *Louisiana.*

The motions of Texas for an order to take depositions and for the appointment of a Special Master are denied. The motion of the United States for judgment is granted. The parties, or either of them, may before September 15, 1950, submit the form of decree to carry this opinion into effect.

*So ordered.*

MR. JUSTICE JACKSON and MR. JUSTICE CLARK took no part in the consideration or decision of this case.

MR. JUSTICE REED, with whom MR. JUSTICE MINTON joins, dissenting.

This case brings before us the application of *United States* v. *California,* 332 U. S. 19, to Texas. Insofar as Louisiana is concerned, I see no difference between its situation and that passed upon in the *California* case.

---

[10] Act of May 16, 1941, L. Texas, 47th Leg., p. 454.

[11] Act of May 23, 1947, L. Texas, 50th Leg., p. 451.

Texas, however, presents a variation which requires a different result.

The *California* case determines, p. 36, that since "paramount rights run to the states in inland waters to the shoreward of the low water mark, the same rationale leads to the conclusion that national interests, responsibilities, and therefore national rights are paramount in waters lying to the seaward in the three-mile belt." Thus the Court held, p. 39, that the Federal Government has power over that belt, an incident of which is "full dominion over the resources of the soil under that water area, including oil." But that decision was based on the premise, pp. 32–34, that the three-mile belt had never belonged to California. The *California* case points out that it was the United States which had acquired this seacoast area for the Nation. Sovereignty over that area passed from Mexico to this country. The Court commented that similar belts along their shores were not owned by the original seacoast states. Since something akin to ownership of the similar area along the coasts of the original states was thought by the Court to have been obtained through an assertion of full dominion by the United States to this hitherto unclaimed portion of the earth's surface, it was decided that a similar right in the California area was obtained by the United States. The contrary is true in the case of Texas. The Court concedes that, prior to the Resolution of Annexation, the United States recognized Texas ownership of the three-league area claimed by Texas.[1]

The Court holds immaterial the fact of Texas' original ownership of this marginal sea area, because Texas was admitted on an "equal footing" with the other states by the Resolution of Annexation. 5 Stat. 797. The scope of

---

[1] See the statement in the Court's opinion as to the chapters of Texas history.

the "equal footing" doctrine, however, has been thought to embrace only political rights or those rights considered necessary attributes of state sovereignty. Thus this Court has held in a consistent line of decisions that, since the original states, as an incident of sovereignty, had ownership and dominion over lands under navigable waters within their jurisdiction, states subsequently admitted must be accorded equivalent ownership. *E. g., Pollard's Lessee* v. *Hagan,* 3 How. 212; *Martin* v. *Waddell,* 16 Pet. 367. But it was an articulated premise of the *California* decision that the thirteen original states neither had asserted ownership nor had held dominion over the three-mile zone as an incident of sovereignty.

"Equal footing" has heretofore brought to a state the ownership of river beds, but never before has that phrase been interpreted to take away from a newly admitted state property that it had theretofore owned. I see no constitutional requirement that this should be done and I think the Resolution of Annexation left the marginal sea area in Texas. The Resolution expressly consented that Texas should retain all "the vacant and unappropriated lands lying within its limits." An agreement of this kind is in accord with the holding of this Court that ordinarily lands may be the subject of compact between a state and the Nation. *Stearns* v. *Minnesota,* 179 U. S. 223, 245. The Court, however, does not decide whether or not "the vacant and unappropriated lands lying within its limits" (at the time of annexation) includes the land under the marginal sea. I think that it does include those lands. Cf. *Hynes* v. *Grimes Packing Co.,* 337 U. S. 86, 110. At least we should permit evidence of its meaning.

Instead of deciding this question of cession, the Court relies upon the need for the United States to control the area seaward of low water because of its international responsibilities. It reasons that full dominion over the

resources follows this paramount responsibility, and it refers to the California discussion of the point. 332 U. S. at 35. But the argument based on international responsibilities prevailed in the *California* case because the marginal sea area was staked out by the United States. The argument cannot reasonably be extended to Texas without a holding that Texas ceded that area to the United States.

The necessity for the United States to defend the land and to handle international affairs is not enough to transfer property rights in the marginal sea from Texas to the United States. Federal sovereignty is paramount within national boundaries, but federal ownership depends on taking possession, as the *California* case holds; on consent, as in the case of places for federal use; or on purchase, as in the case of Alaska or the Territory of Louisiana. The needs of defense and foreign affairs alone cannot transfer ownership of an ocean bed from a state to the Federal Government any more than they could transfer iron ore under uplands from state to federal ownership. National responsibility is no greater in respect to the marginal sea than it is toward every other particle of American territory. In my view, Texas owned the marginal area by virtue of its original proprietorship; it has not been shown to my satisfaction that it lost it by the terms of the Resolution of Annexation.

I would deny the United States motion for judgment.

Mr. Justice Frankfurter.

Time has not made the reasoning of *United States* v. *California,* 332 U. S. 19, more persuasive but the issue there decided is no longer open for me. It is relevant, however, to note that in rejecting California's claim of

ownership in the off-shore oil the Court carefully abstained from recognizing such claim of ownership by the United States.  This was emphasized when the Court struck out the proprietary claim of the United States from the terms of the decree proposed by the United States in the *California* case.*

I must leave it to those who deem the reasoning of that decision right to define its scope and apply it, particularly to the historically very different situation of Texas.  As is made clear in the opinion of MR. JUSTICE REED, the submerged lands now in controversy were part of the domain of Texas when she was on her own.  The Court now decides that when Texas entered the Union she lost what she had and the United States acquired it.  How that shift came to pass remains for me a puzzle.

---

*The decree proposed by the United States read in part:

"1. The United States of America is now, and has been at all times pertinent hereto, possessed of paramount rights *of proprietorship* in, and full dominion and power over, the lands, minerals and other things underlying the Pacific Ocean . . . ."

The italicized words were omitted in the Court's decree.  332 U. S. 804, 805.