## THE OHIO OIL COMPANY ET AL V. BASCOM GILES, COMMISSIONER OF THE GENERAL LAND OFFICE, ET AL.

No. A-2687. Decided December 6, 1950.
Rehearing overruled February 7, 1951.
(235 S. W., 2d Series, 630.)

*Black & Stayton* and *Ireland Graves,* all of Austin, *Clayton L. Orn,* of Houston, *A. M. Gee,* of Findlay, Ohio, and *Basil H. Lucas, Jr.,* of Pittsburgh, Pa., for relators.

The pendency of the action of the United States v. Texas, in which the title to the lands in controversy is being litigated, invokes the application of Article 5421-i, R.S., and by the opera-

tion of the statute the running of the primary term of the leases in question has been suspended during the pendency of such litigation. Austin National Bank v. Sheppard, 123 Texas 272, 71 S. W. 2d 243; Rhoads Drilling Co. v. Allred, 123 Texas 229, 70 S. W. 2d 576; Laidlaw Brothers v. Marrs, State Supt., 114 Texas 561, 273 S. W. 789.

*Price Daniel,* Attorney General, *Ben R. Rice, III,* Former Assistant Attorney General, and *Jesse P. Luton, Jr.,* Assistant Attorney General, for respondents.

If the annual rentals required by statute and stipulated in relators' leases are "obligations", which respondents deny, and if Article 5421-i is interpreted as releasing or suspending them, Article 5421-i is in violation of Article 3, section 55, of the Constitution of Texas. Freeman.v. Magnolia Petroleum Co., 141 Texas 274, 171 S. W. 2d 339; Texas Co. v. Curry, 229 S. W. 643; Empire Gas & Fuel Company v. State, 121 Texas 138, 47 S. W. 2d 265.

MR. JUSTICE SHARP delivered the opinion of the Court.

The Ohio Oil Company and Melben Oil Company, relators, seek by this original mandamus proceeding to compel Bascom Giles, Jesse James, and R. S. Calvert, respondents, to refund to relators the sum of $123,360.00, paid by relators to Bascom Giles, and that he be ordered to recognize certain mineral leases as valid and subsisting, without the payment or necessity to pay any rentals for the period during which such leases may be held between the commencement of the litigation and ten months and sixteen days, or, in the alternative, five months and twenty-one days after the rendition of a final judgment by the Supreme Court of the United States in the case of United States v. Texas, [339 U. S. 707] and that respondents be ordered to recognize that the primary term of such leases will run for a period of three years ten months and sixteen days after the rendition of such final judgment, or, in the alternative, for three years five months and twenty-one days after the rendition of such judgment.

As a basis for this action, relators allege that Bascom Giles is the Commissioner of the General Land Office of the State of Texas, Jesse James is the State Treasurer of the State of Texas, and R. S. Calvert is the Comptroller of Public Accounts of the State of Texas; that Jesse James now has in his possession, in a suspense account, $123,360.00 belonging to relators, which

he is obligated under the laws of Texas to refund to them, but which he has failed and refused to do; that such sum of money was delivered to Bascom Giles, who unlawfully required relators to pay it to him on November 7, 1949, for the annual rental on 123,360 acres of submerged lands in the Gulf of Mexico on which relators own the oil and gas leasehold estates; that at the time Giles required relators to pay the annual rentals in order to avoid a forfeiture of the oil and gas leasehold estates, no rental was actually due and owing under the laws of the State of Texas, because the obligation of relators to pay the rentals was under Article 5421-i, Revised Civil Statutes, suspended and set at rest during the pendency of United States v. Texas, which was an action brought by the United States on December 21, 1948, against Texas in the Supreme Court of the United States to recover title to or paramount rights in and dominion over the submerged lands and minerals in the Gulf of Mexico within the boundaries of Texas, including the lands and minerals on which relators were required by Giles to pay the annual rentals.

That relators are now the owners, in equal shares, of the oil and gas leasehold estates on 85 tracts of submerged lands in the Gulf of Mexico, aggregating in all 112,830 acres, and the owners of undivided interests in the oil and gas leasehold estates on twelve additional tracts of submerged lands in the Gulf of Mexico, aggregating in all 10,530 acres; and a description of the oil and gas leases and the tracts included therein is attached to relators' petition filed in this cause and marked Exhibit "A"; that each of the 89 leases described in Exhibit "A" was sold and awarded to the lessee therein named at a regular meeting of the School Land Board held in the General Land Office on the 7th day of November, 1947, after the Board had finally determined that the lessee had offered the highest and best bid for such land; that there is attached to the petition, and marked Exhibit "B", a correct copy of one of the oil and gas leases described in Exhibit "A", the remaining 88 oil and gas leases so described in Exhibit "A" were executed on a printed form similar in all respects to the oil and gas lease attached to the petition marked Exhibit "B", with some immaterial exceptions; that on August 2, 1948, relators agreed in writing with the Humble Oil & Refining Company, which owns an undivided one-half interest in four of the oil and gas leases, that they would pay on their own behalf and on behalf of Humble Oil & Refining Company all annual rentals that might become due on such four leases, and on February 3, 1949, agreed in writing with Stanolind Oil & Gas Company, which

owns an undivided 56.9106 percent interest in eight of the tracts covered by the oil and gas leases thereon, that they would pay on their own behalf and on behalf of Stanolind Oil & Gas Company all annual rentals that might become due on such eight leases.

That neither oil nor gas has ever been produced from the submerged lands described in the 89 oil and gas leases, but relators paid to the Commissioner of the General Land Office, on or before the 7th day of November, 1948, the annual rentals therein provided for, in the aggregate sum of $123,360.00; that after relators had paid such annual rentals due on November 7, 1948, the United States filed in the Supreme Court of the United States on December 21, 1948, a motion for leave to file a complaint against the State of Texas; that the United States in the complaint set out in detail its claim to the lands involved in that suit, and it was alleged that the State of Texas claimed some right, title, or interest in the lands, minerals and other things adverse to the United States, and had negotiated and executed oil and gas leases with various persons and corporations in violation of the rights of the United States; that the lessees had paid to the State substantial sums of money in rents, royalties, and bonuses reserved under the leases, but that neither the State nor its lessees had recognized the rights of the United States, nor had they paid to the United States either the value of the petroleum and other things taken from the area or the royalties therefrom; that in that suit the United States prayed that a decree be entered declaring the rights of the United States as against the State of Texas and enjoining the State of Texas and all persons claiming under it from continuing to trespass upon the area in violation of the rights of the United States, and requiring the State of Texas to account to the United States for all sums of money derived by it from the area involved subsequent to June 23, 1947.

That the State of Texas filed in the Supreme Court of the United States its objections to the motion of the United States for leave to file its complaint, but the Supreme Court on May 16, 1949, granted leave to file the complaint; and the issue involved in that suit is whether the United States or the State of Texas is the owner in fee simple of the submerged areas in the Gulf of Mexico involved therein, and whether the United States is possessed of title, paramount rights in, and full dominion and power over such areas.

That the lands and minerals which the United States seeks

to recover from the State of Texas in that suit include the tracts and the oil and gas covered by and included in the leases described in Exhibit "A"; and while relators are not disputing or questioning the right, title, or interest of the State of Texas in and to the portion of the Gulf of Mexico within its boundaries, and are not questioning the power and authority of the Commissioner of the General Land Office to execute the oil and gas leases described in Exhibit "A", nevertheless, by virtue of the filing of the above-described complaint there is now pending in the Supreme Court of the United States a suit wherein the United States is disputing the power and authority of the State of Texas to execute the oil and gas leases described above, and is seeking to recover title to or paramount rights in and over the submerged areas included in such oil and gas leases; and that relators allege that by virtue of such suit the oil and gas leases described herein have become and still are involved in litigation, and involve the power and authority of the Commissioner of the General Land Office to execute them, and that under the provisions of Article 5124-i the running of the primary terms of such oil and gas leases have been suspended, and all obligations imposed upon relators, including the payment of the annual rentals, have been set at rest during the period of the pendency of such litigation.

Relators allege that on or about November 3, 1949, they were informed by Bascom Giles that the Attorney General of Texas had advised him that Article 5421-i did not apply to the annual rentals which were due and payable on November 7, 1949, under the above-described 89 oil and gas leases, and that the rentals would be due on November 7, 1949, and should be paid in accordance with the terms and provisions of the leases, if relators desired to maintain the leases in force after November 7, 1949; and that Giles further informed relators that under and by virtue of the opinion given him by the Attorney General he was compelled to demand that relators pay the annual rentals on or before November 7, 1949, if they desired to avoid a forfeiture of the oil and gas leasehold estates; and that relators, desiring to maintain the oil and gas leases, and avoid a forfeiture, paid under protest to Giles on November 7, 1949, the annual rentals on the 89 oil and gas leases, in the sum of $123,360.00, and simultaneously filed a protest wherein they informed Giles that it was their contention that the payment of the annual rentals had been suspended and set at rest during the pendency of the case of United States v. Texas, and that they were paying the rentals in order to avoid a forfeiture of the leases; that they requested Giles to take such action as might be necessary for

him to refund the money in the event it was ultimately determined that he had unlawfully demanded and required them to pay such rentals on November 7, 1949.

That Giles delivered the $123,360.00 to Jesse James, who now has such fund in his possession in a suspense account, to be disposed of in accordance with the demands and instructions of Giles and in accordance with Article 4388, Revised Civil Statutes; that relators have demanded that respondents refund and return the money so paid to them, but they have failed and refused to do so; that the running of the primary term of the leases was suspended on December 21, 1948, when the United States filed with the Clerk of the Supreme Court its motion for leave to file its complaint in United States v. Texas, together with a copy of the complaint, and that at the time the motion was filed, one year, one month and fourteen days of the primary term of the leases had run, and three years, ten months and sixteen days remained to run, and that, consequently, the primary term of the leases will, as a matter of law, run for a period of three years, ten months and sixteen days after the rendition of a final judgment in United States v. Texas; that the annual rental for the year November 7, 1948, to November 7, 1949, was paid by relators on or before November 7, 1948; that when the litigation was commenced on December 21, 1948, and the running of the primary term of the leases was suspended, only one month and fourteen days of the annual period for which rentals were paid on November 7, 1948, had run, and ten months and sixteen days remained to run. They alleged that no rentals are or will be payable for the period beginning on December 21, 1948, until ten months and sixteen days after the rendition of a final judgment in United States v. Texas, and that relators are entitled to hold leases for such period without liability for any rentals. They also alleged, in the alternative, that if the running of the primary term of the leases was not suspended on December 21, 1948, when the United States filed its motion for leave to file its complaint, the running of the primary term of the leases was suspended on May 16, 1949, when the Supreme Court granted the United States leave to file its complaint; in which event the primary term of the leases will, as a matter of law, run for a period of three years, five months and twenty-one days after the rendition of the final judgment, and no rentals are or will be payable for the period beginning on May 16, 1949, until five months and twenty-one days after the rendition of such final judgment, and that relators are entitled to hold the leases for such period without liability for any rentals.

Since this Court granted relators' motion for leave to file petition for writ of mandamus, the case of United States v. Texas was decided and final judgment rendered therein, and motion for new trial was overruled on October 16, 1950. It was decreed that the United States is possessed of paramount rights in, and full domain and power over, the lands and minerals in controversy, and that Texas has no title thereto or property rights therein. The effect of that judgment is that the Commissioner of the General Land Office had no authority to execute the oil and gas leases in question. Therefore, all issues in this case are eliminated except the issue as to whether relators are entitled to recover the sum of $123,360.00 paid for rentals on November 7, 1949, under protest.

Respondents base their objection to the relief sought by relators on four counterpoints, which are as follows:

"1. Payment of the annual rentals stipulated in relators' leases is not excused by Article 5421-i because the rentals are not 'obligations' within the meaning of the statute, such rentals being payable only at the option of lessee for each additional year that lessee elects to retain the leases.

'2. If the annual rentals required by statute and stipulated in relators' leases are 'obligations' and if Article 5421-i is interpreted as releasing or suspending them, Article 5421-i is in violation of Article 3, Section 55, of the Constitution of Texas.

"3. The suspension of the running of the primary term of relator's leases actually amounts to an extention of the life of the leases and does not affect the agreement to pay annual rentals during 'the life of the leases.'

"4. Article 5421-i, extending the primary term of relators' leases, became effective as to such leases on May 16, 1949, and not before, because prior to that date relators' leases had not 'become involved in litigation.' "

The pertinent clauses of the leases are as follows:

"1. If neither oil nor gas be produced in commercial quantities within five years, this lease shall terminate.

"2. On or before one year from the date of this lease and annually thereafter for each of the following years during the the life of this lease, the lessee shall pay to the Commissioner of the General Land Office, Austin, Texas, an annual rental of One Dollar ($1.00) per acre, unless oil and/or gas are being produced in commercial quantities. When royalties paid during any

year during the life of this lease equal or exceed the annual rental, no annual rental will be due the following year; otherwise annual delay rental shall be due and payable in an amount sufficient to make the total of annual royalty and rental equal to One Dollar ($1.00) per acre.

"4. If production should be secured and should for any reason cease and royalty not be paid, the Lessee shall, at the end of the lease year in which royalty ceased to be paid and annually thereafter in advance pay $1.00 per acre so long as such Lessee may desire to retain the rights acquired under this lease, not to exceed five years from the date hereof.

"8. This lease contemplates the reasonable development, for the minerals hereby covered, of the above described land, including the putting down of as many wells as the facts may justify. The Lessee shall adequately protect the oil and gas under the above described land from drainage from the adjacent lands or leases. Neither the bonus, delay rentals, nor royalties, paid or to be paid hereunder, shall relieve Lessee from the obligations herein expressed.

"15. The Lessee may relinquish the rights granted hereunder to the State at any time by recording the relinquishment in the county where this area is situated and filing the same in the General Land Office within ninety days after its execution, accompanied by a filing fee of one dollar. Such relinquishment will not have the effect of releasing the Lessee from any liability theretofore accrued in favor of the State.

"16. If the Lessee should fail or refuse to make payment of any sum due, either as rental on this lease or for royalty on the production, within thirty days after it shall become due, * * * this lease shall be subject to forfeiture by the Commissioner of the General Land Office, and when forfeited the area shall again be subject to lease to the highest bidder, under the same regulations controlling the original sale of leases."

The leases involved also contain a recital that they were executed "pursuant to Chapter 271, Acts of the 42nd Legislature, 1931, as amended by House Bill 9, Acts of the 46th Legislature, 1939, Chapter 82, Acts of the 50th Legislature, 1947, and other applicable laws."

Article 5421-i was in force when the leases were executed, and it reads as follows:

"The running of the primary term of any oil, gas, or mineral

lease heretofore or hereafter issued by the Commissioner of the General Land Office, *which lease has been, is, or which may hereafter become involved in litigation relating to the validity of such lease or to the authority of the Commissioner of the General Land Office to lease the land covered thereby, shall be suspended, and all obligations imposed by such leases shall be set at rest during the period of such litigation.* After the rendition of final judgment in any such litigation the running of the primary term of such leases shall commence again and continue for the remainder of the period specified in such leases and all obligations and duties imposed thereby shall again be operative; provided such litigation has been instituted at least six (6) months prior to the expiration of the primary term of any such leases." (Emphasis ours.) Acts 1941, 47th Leg., p. 1405, ch. 637, sec. 1.

■ Respondents contend in their first two counterpoints that the rentals stipulated in the leases are not "obligations" within the meaning of Article 5421-i, and that if that Article is interpreted as releasing or suspending the "obligations," such article is in violation of Article III, Section 55, of the Constitution of Texas.

The leases describe the obligations assumed by relators and by the State. Relators obligated themselves to make certain payments to the State, and the leases stipulated that unless those obligations were promptly met, the leases were subject to forfeiture. Article 5421-i was one of "the other applicable laws" referred to in the leases, and must be read into the leases. The word "obligation" is not specifically defined either in the leases or in Article 5421-i. The State has always tried to deal fairly with those who purchase its public lands and mineral rights. This policy has been pursued in order to obtain from purchasers the highest and best bids for such lands and mineral rights. If the title to any of the State's property is defective or under a cloud, the title is cleared before the property is offered for sale. In some instances, where title to part of the land failed, a refund of the purchase money has been authorized. State v. Bradford, 121 Texas 515, 50 S. W. 2d 1065. In this instance the State in good faith offered to lease the minerals under certain of its submerged lands, and the lessees accepted in good faith the offer of the State, and bid for the mineral rights. The lessees had the right to rely upon the provisions of Article 5421-i when the leases were executed by the State and accepted by them. The State authorized the Commissioner of the General Land Office to execute such leases, and Article 5421-i, which must

be considered with the leases, provided that if such leases should become involved in litigation "all obligations imposed by such leases shall be set at rest during the period of such litigation."

The respondents contend that in the event of failure of the lessees to pay the rentals, the State can only forfeit the leases; that there is no obligation to pay, and that Article 5421-i does not apply. It is not the policy of the State to invoke the harsh remedy of forfeiture to recover its public lands from good faith purchasers. The history of legislation dealing with the sale of public lands shows that the word "obligation" is used in connection with the consideration to be paid by the purchasers of such lands, and that such consideration or obligation is enforcible by forfeiture. The case of Island City Savings Bank et al v. Dowlearn, 94 Texas 383, 60 S. W. 754, involved a statute which described the consideration to be paid by a purchaser of public land as an obligation enforcible by forfeiture, and in that case this Court said: "It is manifest from the course of legislation that the State has never desired to forfeit any contract for the purchaser of the free school lands, but the clause of forfeiture has been used to stimulate payment of the interest, and as a last resort to repossess the land."

In this case the lessees had to pay the rentals in order to keep the leases in force. The leases authorize the lessees to relinquish the rights granted thereunder by recording such relinquishment as provided for in the leases, but the lessees would not thereby be relieved from any liability which had theretofore accrued in favor of the State. The leases also provide that if the rentals are not paid as provided for therein, the leases shall be subject to forfeiture; and if the leases are not forfeited, lessees are obligated to pay the accrued rentals due the State. Certain requirements of these leases constitute obligations, even though they can be enforced by forfeiture or by a relinquishment of the rights expressed therein. Article 5372 provides that if any person operating under it fails or refuses to make payment of any sum within thirty days after it becomes due, the right acquired under the permit or lease shall be subject to forfeiture. In the case of Empire Gas & Fuel Co. v. State of Texas, 121 Texas 138, 47 S. W. 2d, 265, opinion rendered December 24, 1932, the State was given judgment against the landowner and lessee for failure to pay delay rentals to the State, even though the statute gives only the right of forfeiture. In that case this Court held that the Legislature was not authorized to release or extinguish a valid obligation due

the State, and that any law undertaking to do so would be a violation of the Constitution.

■ Article 5421-i was enacted in 1941. It relates to mineral leases issued prior to and after its enactment. Respondents contend that the entire act is unconstitutional because it is endeavored by the act also to include leases executed prior to its enactment, and suspend all obligations imposed by such leases during the period that they are in litigation. It is the duty of the court, if it lawfully can be done, to construe a statute so as to render it valid. Where a statute contains words or provisions which are legal and others which are not, effect may be given to the legal words or provisions by separating them from the illegal ones. If we assume, without deciding, that the words or provisions which relate to leases executed prior to the enactment of the act are illegal, and the illegal part can be separated from the legal, it is still the duty of the court to sustain the valid part of the statute. Since the part of the act relating to leases executed prior to the enactment of Article 5421-i is not involved in this case, it is not necessary to consider or construe that part of the act. When we consider the part of the act involved in this case, and construe it in the light of the many decisions in this State in point, we find that it is constitutional. Empire Gas & Fuel Co. v. State of Texas, 121 Texas 138, 47 S. W. 2d 265; State v. Laredo Ice Co., 96 Texas 461, 73 S. W. 951; City of Rockdale v. Cureton, 111 Texas 136, 229 S. W. 852; City of Taylor v. Taylor Bedding Mfg. Co., Texas Civ. App., 215 S. W. 2d 215, writ refused. We further hold that the provisions of the act involved here do not violate Article III, Section 55, of the Constitution of Texas.

Article 5421-i relieves the lessees of the obligation to pay delay rentals during the suspended period, and respondents' third counterpoint is overruled.

It appears that relators and respondents desire to leave the leases involved as they existed at the time of their execution, and that they be suspended as provided for in Article 5421-i during the litigation of the case of United States v. Texas pending in the Supreme Court of the United States. In that case Texas has a motion pending in the Supreme Court of the United States which has not been acted upon, but relators are not parties in that suit. It is also suggested that an arrangement may be made between the United States and Texas with respect to the tidelands of Texas, and in that event the leases here would be recognized.

Relators contend that the suspension took effect on December 21, 1948, at which time the United States deposited with the Clerk of the Supreme Court its motion for leave to file its complaint against Texas. Respondents, on the other hand, contend that the suspension did not take effect until May 16, 1949, when the Court granted the United States leave to file the complaint. Since all issues except the payment of rentals have been eliminated in this case, relators having paid under protest the sum of $123,360.00 on November 7, 1949, makes it immaterial whether the suit was commenced on December 21, 1948, when the motion to file was presented to the clerk, or on May 16, 1949, when the Court granted leave for the petition to be filed. Under either theory the litigation was pending when relators paid the rentals under protest on November 7, 1949, and it is not necessary to decide the question when the suit was commenced, and neither do we decide the future status of the leases involved here between relators and the State.

The writ of mandamus will issue commanding Bascom Giles, R. S. Calvert, and Jesse James to refund to relators the sum of $123,360.00, the amount of rentals paid by relators to Bascom Giles under protest on November 7, 1949, for the ensuing year.

Opinion delivered December 6, 1950.

Rehearing overruled February 7, 1951.