CHOY, Circuit Judge:
 

 Defendants-appellants Clifford and Bertha Gardner (“Gardners”) appeal the summary judgment granted in favor of plaintiff-appel-lee United States. Gardners claim that the
 
 *-268
 
 state of Nevada, not the United States, is the rightful owner of the public lands within Nevada. The district court granted the United States’ request for an injunction against Gardners’ unauthorized grazing of livestock upon federal forest land, and also ordered Gardners to pay a fee for the unauthorized grazing. We affirm.
 

 Factual and Procedural Background
 

 Clifford and Bertha Gardner own the Daw-ley Creek Ranch in Nevada, near the Humboldt National Forest. The Humboldt National Forest is part of the National Forest System, which includes sections of “federally owned forest, range, and related lands” reserved or withdrawn from the public domain of the United States. 16 U.S.C. § 1609(a). The administration of the national forests is vested in the Secretary of Agriculture. 16 U.S.C. § 472. The Granger-Thye Act provides independent authority for the Secretary of Agriculture to issue permits for grazing on national forest land. 16 U.S.C. § 5801. Under the regulations of the Secretary of Agriculture, the grazing of livestock without Forest Service authorization on national forest lands is subject to the assessment of an “unauthorized grazing use” fee. 36 C.F.R. § 222.50(h).
 

 In 1988, the Forest Service issued a ten-year grazing permit to Gardners, which allowed a portion of Gardners’ cattle to graze on certain allotments of the Humboldt National Forest subject to the terms and conditions of the permit. A clause in the permit stated:
 

 It is fully understood and agreed that this permit may be suspended or cancelled, in whole or in part, after written notice, for failure to comply with any of the terms and conditions specified in Parts 1, 2, and 3 hereof, or any of the regulations of the Secretary of Agriculture on which this permit is based, or the instructions of Forest officers issued thereunder....
 

 Immediately above the signature line on the permit are the words: “I HAVE REVIEWED AND ACCEPT THE TERMS OF THIS PERMIT.” Cliff Gardner signed the permit.
 

 In August of 1992, a fire burned over 2,000 acres of the Mica C & H and Mica Creek Addition Allotments. The Forest Service and the Nevada Department of Wildlife reseeded the majority of the burned area in October and November of 1992. The Humboldt National Forest Land and Resource Management Plan specifies that reseeded areas must not be grazed by livestock for a two year period, to give the vegetation time to grow. Accordingly, in September 1992, the Forest Service advised Gardners that the burned area would be closed to grazing during 1993 and 1994. Gardners did not graze livestock in the affected area during 1993.
 

 On May 13,1994, Gardners sent a letter to the Forest Service stating that they intended to resume grazing on the burned area within 3 days. On May 18,1994, the Forest Service observed Gardners’ livestock grazing on the burned area. On May 19, 1994, the Forest Service hand-delivered a letter to Gardners advising that they were violating the terms and conditions of the permit by grazing cattle in the burned area, and requiring that the livestock be removed from the burned area by May 22, 1994. Gardners did not remove the livestock.
 

 The Forest Service subsequently revoked Gardners’ permit, and told Gardners that they would be billed for the unauthorized grazing at a rate of $6.12 per “head month.” Additionally, the Forest Service informed Gardners that the cancellation decision could be contested through an administrative appeal. Gardners opted not to administratively appeal the decision.
 

 Gardners continued to graze livestock on the burned area throughout the 1994 grazing season. Gardners also refused to pay the fee for the unauthorized grazing, assessed at $4,473.72, to the Forest Service.
 

 On May 23,1995, the United States filed a complaint seeking an injunction against Gardners to prevent further unauthorized grazing of Gardners’ livestock in the Humboldt National Forest. The United States also sought damages based on Gardners’ unauthorized use of the national forest for grazing. On October 4, 1995, the district court granted the United States’ motion for summary judgment. The district court enjoined
 
 *-267
 
 Gardners from further unauthorized grazing and ordered them to remove their livestock from the forest area. The court also ordered Gardners to pay $7,030.41 to the United States-as a fee for unauthorized grazing as of September 8,1995.
 

 Analysis
 

 Gardners do not contest that they grazed livestock on forest land without a permit or other authorization from the Forest Service, nor do they contest the amount of the fee assessed. Instead, Gardners assert that the unappropriated lands in the state of Nevada, of which the Humboldt National Forest is a part, are not territory or other property belonging to the United States, and that therefore the Forest Service does not have jurisdiction to regulate use of the forest land or to levy fees for unauthorized activities within it.
 

 This court reviews a grant of summary judgment de novo.
 
 Jesinger v. Nevada Fed. Credit Union,
 
 24 F.3d 1127, 1130 (9th Cir.1994).
 

 I. The United States’ Title to Federal Land in Nevada
 
 [1]
 

 Gardners argue that grazing their livestock in the Humboldt National Forest without a permit does not constitute trespass because the federal government does not have title to the land on which the grazing took place. Gardners contend that, while the United States may have received the land in question from Mexico in the Treaty of Guadalupe Hidalgo in 1848, the United States was entitled only to hold the land in trust for the creation of future states, and was not authorized to retain the land for its own purposes. After Nevada became a state, Gardners argue, all of the public lands within the state boundaries reverted to the state of Nevada.
 
 [2]
 

 The United States and Mexico signed the treaty of Guadalupe Hidalgo in 1848. In that treaty, Mexico ceded land that includes the present-day state of Nevada to the United States. 9 Stat. 922 (1848);
 
 see also Sparrow v. Strong,
 
 70 U.S. (3 Wall.) 97, 104, 18 L.Ed. 49 (1865) (“The Territory, of which Nevada is a part, was acquired by Treaty.”). The language of the Treaty itself refers to the land ceded by Mexico to the United States as “territories previously belonging to Mexico, and which remain for the future within the limits of the United States.” 9 Stat. 922, 929 (1848). Courts in the United States have uniformly found that title to the land first passed to the United States through the Treaty.
 
 See, e.g., United States v. California,
 
 436 U.S. 32, 34 n. 3, 98 S.Ct. 1662, 1663 n. 3, 56 L.Ed.2d 94 (1978) (stating that, under the Treaty, “all nongranted lands previously held by the Government of Mexico passed into the federal public domain”);
 
 Cappaert v. United States,
 
 426 U.S. 128, 131, 96 S.Ct. 2062, 2066, 48 L.Ed.2d 523 (1976) (stating that a limestone cavern located in Nevada is “situated on land owned by the United States since the Treaty of Guadalupe Hidalgo in 1848”).
 

 The claim by Gardners that it is the duty of the United States to hold public lands in trust for the formation of future states is founded on a case dealing with land acquired by the United States from the thirteen original states. In that case,
 
 Pollard’s Lessee v. Hagan,
 
 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845), the Supreme Court discussed the extent of the United States’ authority over lands ceded to it from Virginia and Georgia to discharge debt incurred by those states during the Revolutionary War. The Court stated that the United States held this land
 
 *-266
 
 in trust for the establishment of future states.
 
 Id.
 
 44 U.S. (3 How.) at 222. Once those new states were established, the United States’ authority over the land would cease.
 
 Id.
 
 at 221-23. This decision was based on the terms of the cessions of the land from Virginia and Georgia to the United States. Before becoming a state, however, Nevada had no independent claim to sovereignty, unlike the original thirteen states. Therefore, the same reasoning is not applicable to this case, in which the federal government was the initial owner of the land from which the state of Nevada was later carved.
 

 Thus, as the United States has held title to the unappropriated public lands in Nevada since Mexico ceded the land to the United States in 1848, the land is the property of the United States. The United States Constitution provides in the Property Clause that Congress has the power “to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.” U.S. Const, art. IV, § 3, el. 2. The Supreme Court has consistently recognized the expansiveness of this power, stating that “[t]he power over the public land thus entrusted to Congress is without limitations.”
 
 Kleppe v. New Mexico,
 
 426 U.S. 529, 539, 96 S.Ct. 2285, 2291, 49 L.Ed.2d 34 (1976);
 
 United States v. San Francisco,
 
 310 U.S. 16, 29, 60 S.Ct. 749, 756, 84 L.Ed. 1050 (1940).
 
 See also Alabama v. Texas,
 
 347 U.S. 272, 273, 74 S.Ct. 481, 481-82, 98 L.Ed. 689 (1954);
 
 United States v. California,
 
 332 U.S. 19, 27, 67 S.Ct. 1658, 1662-63, 91 L.Ed. 1889 (1947);
 
 Gibson v. Chouteau,
 
 80 U.S. (13 Wall.) 92, 99, 20 L.Ed. 534 (1871);
 
 United States v. Gratiot,
 
 39 U.S. (14 Pet.) 526, 537, 10 L.Ed. 573 (1840). Moreover, the Supreme Court has noted that Congress “may deal with [its] lands precisely as an ordinary individual may deal with his farming property. It may sell or withhold them from sale.”
 
 Light v. United States,
 
 220 U.S. 523, 536, 31 S.Ct. 485, 488, 55 L.Ed. 570 (1911) (internal quotation marks and citation omitted). Indeed, the establishment of a forest reserve by Congress is a “right[ ] incident to proprietorship, to say nothing of the power of the United States as a sovereign over the property belonging to it.”
 
 Id.
 
 at 537, 31 S.Ct. at 488.
 

 The United States, then, was not required to hold the public lands in Nevada in trust for the establishment of future states. Rather, under the Property Clause, the United States can administer its federal lands any way it chooses, including the establishment of a national forest reserve.
 

 II. The Equal Footing Doctrine
 

 Gardners argue that, under the Equal Footing Doctrine, a new state must possess the same powers of sovereignty and jurisdiction as did the original thirteen states upon admission to the Union. Because the federal government owns over eighty percent of the land in the state of Nevada, Gardners argue, Nevada is not on an equal footing with the original thirteen states.
 
 [3]
 
 Gardners claim that Nevada must have “paramount title and eminent domain of
 
 all
 
 lands within its boundaries” to satisfy the Equal Footing Doctrine.
 

 The meaning of the Equal Footing Doctrine is discussed in
 
 Pollard’s Lessee v. Hagan,
 
 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845). In that ease, the Supreme Court held that the shores of and land beneath navigable waters were reserved to the states, and were not granted by the Constitution to the federal government.
 
 Id.
 
 44 U.S. (3 How.) at 229. New states, the Court reasoned, have the same “rights, sovereignty, and jurisdiction” over the shores of and land beneath navigable waters as do the original states.
 
 Id,.
 

 [4]
 

 
 *-265
 
 However, the Supreme Court has declined to extend the Equal Footing Doctrine to lands other than those underneath navigable waters or waters affected by the ebb and flow of the tides. In
 
 Scott v. Lattig,
 
 227 U.S. 229, 244, 33 S.Ct. 242, 244, 57 L.Ed. 490 (1913), the Supreme Court held that title to an island within a stream did not pass to the state of Idaho, but instead was retained by the United States. The Court stated that because the island “was not part of the bed of the stream or land under the water ... its ownership did not pass to the State or come ■within the disposing influence of its laws.”
 
 Id.
 
 The Court went on to note that the island was “fast dry land, and therefore remained the property of the United States and subject to disposal under its laws....”
 
 Id.
 
 Sixty years later, the Supreme Court characterized its decision in
 
 Scott
 
 as holding that the rule in
 
 Pollard’s Lessee
 
 “does not reach islands or fast lands located within such waters. Title to islands remains in the United States, unless expressly granted along with the stream bed or otherwise.”
 
 Texas v. Louisiana,
 
 410 U.S. 702, 713, 93 S.Ct. 1215, 1221, 35 L.Ed.2d 646 (1973). The Equal Footing Doctrine, then, does not operate to reserve title to fast dry lands to individual states.
 

 Moreover, Supreme Court has long held that the Equal Footing Doctrine refers to “those attributes essential to [a state’s] equality in dignity and power with other States.”
 
 Coyle v. Smith,
 
 221 U.S. 559, 568, 31 S.Ct. 688, 690, 55 L.Ed. 853 (1911). The Court has noted that a new state enters the Union “in full equality with all the others,” and that this equality may forbid a compact between a new state and the United States “limiting or qualifying political rights and obligations.”
 
 Steams v. Minnesota,
 
 179 U.S. 223, 245, 21 S.Ct. 73, 81, 45 L.Ed. 162 (1900). However, “a mere agreement in reference to property involves no question of equality of status.”
 
 Id.
 
 The Court has observed that “[s]ome States when they entered the Union had within their boundaries tracts of land belonging to the Federal Government; others were sovereigns of their soil.”
 
 United States v. Texas,
 
 339 U.S. 707, 716, 70 S.Ct. 918, 922, 94 L.Ed. 1221 (1950). While these disparities may cause economic differences between the states, the purpose of the Equal Footing Doctrine is not to eradicate all diversity among states but rather to establish equality among the states with regards to political standing and sovereignty.
 
 Id.
 

 The Equal Footing Doctrine, then, applies to political rights and sovereignty, not to economic or physical characteristics of the states. Moreover, the Equal Footing Doctrine applies primarily to the shores of and lands beneath navigable waters, not to fast dry lands. Therefore, the Equal Footing Doctrine would not operate, as Gardners argue, to give Nevada title to the public lands within its boundaries.
 

 III. The Validity of Nevada’s “Disclaimer Clause”
 

 When Congress invited Nevada to join the Union in 1864, it mandated that the Nevada constitutional convention pass an act promising that Nevada would “forever disclaim all right and title to the unappropriated public lands lying within said territory, and that the same shall be and remain at the sole and entire disposition of the United States.... ” Nevada Statehood Act of March 21, 1864, 13 Stat. 30, 31 § 4. The state constitutional convention did so. Ordinance of the Nevada Constitution.
 
 [5]
 

 Gardners claim that this clause is invalid and unconstitutional as an attempt to divest Nevada of its title to the unappropriated lands within its boundaries. Gardners cite to
 
 Van Brocklin v. Tennessee,
 
 117 U.S. 151, 167, 6 S.Ct. 670, 679, 29 L.Ed. 845 (1886) for the premise that such disclaimer clauses “are but declaratory, and confer no new right or power upon the United States.” Therefore, Gardners argue, Nevada could not have given the United States title to the public lands within its boundaries through the disclaimer clause.
 

 
 *-264
 
 Gardners are correct in their argument that the disclaimer is declaratory. However, the United States did not need the disclaimer clause to gain title to the public lands in Nevada. The United States already had title to those lands through the Treaty of Guadalupe Hidalgo, and the disclaimer clause was merely a recognition of the preexisting United States title, as opposed to a grant of title from Nevada to the United States.
 

 As aforementioned, Congress’ power under the Property Clause to administer its own property is virtually unlimited.
 
 See, e.g., Kleppe,
 
 426 U.S. at 539, 96 S.Ct. at 2291-92. Indeed, the United States retains title to the public lands within states such as Nevada not due to “any agreement or compact with the proposed new State,” but rather “solely because the power of Congress extend[s] to the subject.”
 
 Coyle,
 
 221 U.S. at 574, 31 S.Ct. at 693. The disclaimer clause, then, is declaratory of the right already held by the United States under the Constitution to administer its property, and as such is valid under the United States Constitution.
 
 Van Brocklin,
 
 117 U.S. at 167, 6 S.Ct. at 679.
 

 TV. The Tenth Amendment
 

 Gardners argue that federal ownership of the public lands in Nevada is unconstitutional under the Tenth Amendment. Such ownership, they argue, invades “core state powers reserved to Nevada,” such as the police power.
 
 [6]
 

 Federal ownership of the public lands within a state does not completely divest the state from the ability to exercise its own sovereignty over that land. The state government and the federal government exercise concurrent jurisdiction over the land. In
 
 Kleppe v. New Mexico,
 
 the Supreme Court held that the Wild Free-roaming Horses and Burros Act was not an impermissible intrusion on the sovereignty of New Mexico. 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976). In so doing, the Court noted:
 

 Absent consent or cession a
 
 State undoubtedly retains jurisdiction over federal lands within its territory,
 
 but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause, [citations omitted] And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause.
 

 Id.
 
 at 543, 96 S.Ct. at 2293 (emphasis added). Indeed, a state may enforce its criminal and civil laws on federal land “so long as those laws do not conflict with federal law.”
 
 California Coastal Comm’n v. Granite Rock Co.,
 
 480 U.S. 572, 580, 107 S.Ct. 1419, 1425, 94 L.Ed.2d 577. The state of Nevada, then, is not being unconstitutionally deprived of the ability to govern the land within its borders. The state may exercise its civil and criminal jurisdiction over federal lands within its borders as long as it exercises its power in a manner that does not conflict with federal law.
 

 V. Guarantee Clause, Equal Protection, and Political Accountability Claims
 

 Gardners argue that the retention by the United States of the unappropriated public lands within the state of Nevada violates the Guarantee Clause of the United States Constitution. Gardners also contend that federal ownership of the public lands in Nevada denies them equal protection of the laws under the Fifth Amendment and fails the “political accountability test.” As it does not appear that these issues were raised before the district court, this court will not consider them.
 
 See, e.g., Singleton v. Wulff,
 
 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976) (“It is the general rule ... that a federal appellate court does not consider an issue not passed upon below.”).
 

 Conclusion
 

 We AFFIRM the judgment of the district court.
 

 [1]
 

 . An Amicus Brief was filed on behalf of the states of New Mexico, Alaska, Maine, Montana, Oregon, Vermont, and, significantly, Nevada supporting the position of the United States in this case. Additionally, a federal district court in Nevada has held that title to the public lands within Nevada’s boundaries rests in the United States.
 
 United States v. Nye County,
 
 920 F.Supp. 1108 (D.Nev.1996).
 

 [2]
 

 . Gardners point out that Nevada recently passed a statute claiming ownership over all public lands within its boundaries, Nev.Rev.Stat. 321.5973. Gardners claim that the passage of this law further demonstrates that title to the public lands in Nevada properly rests in the state, not the federal, government. Gardners fail to note, however, that the Nevada statute by its own terms excludes national forest lands from the public lands claimed by Nevada.
 
 See
 
 Nev. Rev.Stat. § 321.5963.
 

 [3]
 

 . For example, in New Hampshire the federal government owns just under thirteen percent of the land. The federal government owns between two and seven percent of the land within the borders of nine of the other original thirteen states. In Connecticut, New York and Rhode Island, less than one percent of the land is owned by the federal government. Bureau of Land Management, U.S. Department of the Interior, Public Land Statistics 1993, at 5, Table 3 (September 1994).
 

 [4]
 

 . The Supreme Court later described the Equal Footing Doctrine as applicable to “all lands beneath waters subject to the tide’s influence."
 
 Phillips Petroleum Co. v. Mississippi,
 
 484 U.S. 469, 484, 108 S.Ct. 791, 799, 98 L.Ed.2d 877 (1988).
 

 [5]
 

 . After the submission of this case, Gardners filed a document containing "Supplemental Authorities” pursuant to Fed.R.App.P. 28(j). In that document, Gardners discuss,
 
 inter alia,
 
 the rhetoric of the Disclaimer Clause. The disposition of this case is not altered by that discussion or by any of the other "Supplemental Authorities” presented by Gardners.
 

 [6]
 

 . The opinion of the district court contained no ruling on this issue.