STATE OF NEVADA, Richard H. Bryan, Governor of Nevada, Paul Laxalt, United States Senator, Chic Hecht, United States Senator, Barbara Vucanovich, United States Representative in Congress, Harry Reid, United States Representative in Congress, Petitioners,

v.

James D. WATKINS, Secretary of the United States Department of Energy,* Respondent.

STATE OF NEVADA, Petitioner,

v.

U.S. DEPARTMENT OF ENERGY, James D. Watkins, Secretary of the United States Department of Energy, Respondents,

Arizona Public Service Company, Baltimore Gas & Electric Company, Carolina Power & Light Company, Consolidated Edison Company of New York, Inc., Detroit Edison Company, Duke Power Company, Duquesne Light Company, Florida Power & Light Company, Gulf States Utilities Company, Iowa Electric Light & Power Company, Madison Gas and Electric Company, New York Power Authority, Northeast Utilities, Northern States Power Company, Pennsylvania Power & Light Company, Public Service Electric & Gas Company, Union Electric Company, Virginia Power, Wisconsin Electric Power Company, Wisconsin Power and Light Company, and Wisconsin Public Service Corporation, Intervenors.

Nos. 86–7308, 90–70004.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 16, 1990.

Decided Sept. 19, 1990.

---

* James D. Watkins, Secretary of the United States Department of Energy substituted for former Secretary Herrington, Fed.R.App.P. 43(c)(1).

Richard B. Stewart, Asst. Atty. Gen., Peter R. Steenland, Jr., and John A. Bryson, Dept. of Justice, Washington, D.C., for respondent.

Brian McKay, Atty. Gen., Harry W. Swainston, Deputy Atty. Gen., Carson City, Nev., for petitioners.

Jay E. Silberg and Mindy A. Buren, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., for intervenors.

Before WALLACE, ALARCON and WIGGINS, Circuit Judges.

ALARCON, Circuit Judge:

The State of Nevada, Richard Bryan, Paul Laxalt, Chic Hecht, Barbara Vucanovich, and Harry Reid (Nevada) challenge the Secretary of Energy's decision to continue investigation of Yucca Mountain, Nevada as a potential site for the location of a national high-level radioactive waste repository, pursuant to the Nuclear Waste Policy Act of 1982 (NWPA), Pub.L. No. 97–425, 96 Stat. 2211 (1983) (now codified as amended at 42 U.S.C. §§ 10101–10270). The NWPA establishes a comprehensive process for determining the suitability of Yucca Mountain as a repository site. Nevada asserts that the Secretary's decision to continue site investigation is contrary to law because Congress' selection of Yucca Mountain was not constitutional. Nevada also contends that it effected a valid legislative veto of the selection of Yucca Mountain and that this action is not preempted by federal law. Nevada finally contends that the Secretary must promulgate regulations that govern the timing of site disqualification decisions. We disagree and affirm.

## PERTINENT FACTS

Until 1954, the use, control, and ownership of all nuclear technology were subject to a federal monopoly. *English v. General Elec. Co.,* —— U.S. ——, 110 S.Ct. 2270, 2276, 110 L.Ed.2d 65 (1990). The Atomic Energy Act of 1954, 68 Stat. 919 (1954) (codified as amended at 42 U.S.C. §§ 2011–2281), "stemmed from Congress' belief that the national interest would be served if the Government encouraged the private sector to develop atomic energy for peaceful purposes under a program of federal regulation and licensing." *English v. General*

*Elec. Co.,* 110 S.Ct. at 2276. The Act provided for private construction, ownership, and operation of commercial nuclear reactors under the supervision of the Atomic Energy Commission (AEC). *Id.*

Although the AEC, and its successor agency, the Nuclear Regulatory Commission (NRC), were largely successful in promoting the construction of commercial nuclear reactors, these agencies were not successful in resolving the need for safe disposal of the by-products of the generation of nuclear energy. H.R.Rep. No. 491, 97th Cong., 2d Sess. 28, *reprinted in* 1982 U.S. Code Cong. & Admin.News 3792, 3794–95. To address this pressing national problem, Congress enacted the NWPA. 42 U.S.C. § 10131 (1982 & Supp. V 1987).

As originally enacted, the NWPA required the Secretary to issue general guidelines to serve as the primary criteria for the nomination of five sites that were suitable for "site characterization," or study as repository sites. *Id.* § 10132(a) (1982). As defined by the NWPA,

The term "site characterization" means—

(A) siting research activities with respect to a test and evaluation facility at a candidate site; and

(B) activities, whether in the laboratory or in the field, undertaken to establish the geologic condition and the ranges of the parameters of a candidate site relevant to the location of a repository, including borings, surface excavations, excavations of exploratory shafts, limited subsurface lateral excavations and borings, and in situ testing needed to evaluate the suitability of a candidate site for the location of a repository, but not including preliminary borings and geophysical testing needed to assess whether site characterization should be undertaken.

*Id.* § 10101(21) (1982 & Supp. V 1987). Congress provided that a detailed environmental assessment should accompany the nomination of each site. *Id.* § 10132(b)(1)(E) (1982). From these five sites, the Secretary was to recommend

three to the President for site characterization. *Id.* § 10132(b)(1)(B) (1982). The Secretary was authorized to conduct site characterization activities, pursuant to detailed public site characterization plans, at each site approved by the President. *Id.* § 10133(a) (1982). Upon the completion of site characterization at each site, the Secretary was required to recommend a single site to the President for development as a national high-level nuclear waste repository. *Id.* § 10134(a)(1) (1982). If the President approved the recommendation, he was required to transmit it to Congress. *Id.* § 10134(a) (1982). At this point, the State within which the recommended site was located could submit a notice of disapproval to Congress. *Id.* § 10136 (1982 & Supp. V 1987). Congress then had ninety days during its first period of continuous session in which to override the State's notice of disapproval by passage of a joint resolution. *Id.* § 10135(c) (1982 & Supp. V 1987).

Pursuant to this statutory scheme, the Secretary issued general guidelines for the recommendation of repository sites. 49 Fed.Reg. 47714–70 (Dec. 6, 1984) (codified at 10 C.F.R. § 960.5 (1989)). On December 14, 1984, the Secretary issued draft environmental assessments for nine potentially acceptable sites in six states—Louisiana, Mississippi, Nevada, Texas, Utah, and Washington. 49 Fed.Reg. 49540–41 (Dec. 20, 1984). On May 27, 1986, the Secretary nominated five sites for site characterization, one each in Mississippi, Texas, Utah, Nevada, and Washington. 51 Fed. Reg. 19783–84 (June 2, 1986).

On May 28, 1986, Nevada filed case No. 86–7308, in which it sought review by this court of the Secretary's decision to nominate Yucca Mountain, Nevada, for site characterization. Nevada contended that the Secretary was required to establish jurisdiction over Yucca Mountain by State consent or cession, pursuant to the Federal Enclave Clause, U.S. Const. art. I, § 8, cl. 17, and the applicable NRC regulation, 10 C.F.R. § 60.121. Nevada sought declaratory and injunctive relief requiring the Secretary to obtain the Nevada legislature's consent before pursuing site characterization at Yucca Mountain.

On December 22, 1987, Congress amended the NWPA by certain provisions of the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–202, 101 Stat. 1329 (1987), and Pub.L. No. 100–203, 101 Stat. 1330 (1987) (the 1987 NWPA amendments). The 1987 NWPA amendments designated Yucca Mountain as the sole site to be characterized for possible development as a repository site. 42 U.S.C. § 10172 (Supp. V 1987). This legislation was drafted by the Conference Committee. The House version of the budget bill had no provisions amending the NWPA. H.R.Conf.Rep. No. 495, 100th Cong., 1st Sess. 775–76, *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1, 2313–1245, 2313–1521 to –22. The procedures for site characterization established in sections 10133 and 10134 were made applicable only to Yucca Mountain. 42 U.S.C. §§ 10133–10134 (Supp. V 1987). The State of Nevada's right to submit a notice of disapproval to Congress, *id.* § 10136 (1982 & Supp. V 1987), subject to congressional override, was unchanged. *Id.* § 10135 (1982 & Supp. V 1987).

In December 1988, the Secretary issued his final site characterization plan. This plan sets forth the proposed site characterization activities at Yucca Mountain. Pursuant to Nevada law, the Secretary submitted applications for various environmental permits to the appropriate Nevada state agencies. *See* 42 U.S.C. § 7418(a) (1982) (permitting implementation of state plans for particulate matter under the Clean Air Act); 42 U.S.C. §§ 300f to 300j–10 (permitting states to enact an Underground Injection Control Program pursuant to the Safe Drinking Water Act).

During the pendency of those applications, the Nevada legislature passed two joint resolutions. Assembly Joint Resolution 4, passed on January 17, 1989, expresses the legislature's "adamant opposition to the placement of a high-level nuclear waste repository in the State of Nevada." Assembly Joint Resolution 6, passed on January 23, 1989, provides that the federal government shall not establish a repository

at Yucca Mountain "without the prior consent of the Nevada Legislature or a cession of jurisdiction pursuant to chapter 328 of the Nevada Revised Statutes, which consent and cession are hereby refused." Assembly Joint Resolution 6 was premised, in part, on the potential adverse effects on Nevada's economy and environment of siting a nuclear waste repository in that state. On April 19, 1989, both resolutions were transmitted to the President and both Houses of Congress. Congress took no action in response to the transmittal.

On June 22, 1989, the Nevada legislature passed Assembly Bill 222, which was signed into law by the Governor of the State of Nevada on July 6, 1989. Nev.Rev. Stat. § 459.910 (1989). This statute states that "[i]t is unlawful for any person or governmental entity to store high-level radioactive waste in Nevada." *Id.*

In response to a request by the Governor, the Attorney General of the State of Nevada issued an opinion on November 1, 1989, in which he concluded that the State had submitted a valid notice of disapproval pursuant to 42 U.S.C. § 10136 by transmitting Assembly Joint Resolutions 4 and 6 to the Congress, and that the Congress had acceded to the State's disapproval by its inaction. Accordingly, the Attorney General advised the Governor that the Secretary's permit applications were moot and that he should "direct the agencies considering such permits to consider action upon the applications as unnecessary."

On November 14, 1989, the Governor wrote to the Secretary, contending that a review of available information demonstrated that the Yucca Mountain site was unsuitable and, therefore, that site characterization should cease. The Governor also asserted that Nevada had effectively vetoed the selection of the site.

On November 29, 1989, the Secretary reported to Congress that the site characterization at Yucca Mountain should proceed. The Secretary, as part of a restructuring of the site characterization program, recommended that a near-term program of surface-based testing be undertaken to provide an early evaluation of the site's suitability. The Secretary also informed Congress that this proposal was intended to be responsive to Nevada's concerns.

On December 26, 1989, the state administrative agencies returned the Secretary's applications for the required environmental permits. Citing the actions of the Nevada legislature and the Attorney General's November 1, 1989 opinion letter, the agencies stated that "these applications are now moot because the Yucca Mountain Repository is prohibited."

On January 5, 1990, Nevada filed a petition for review of administrative action in case No. 90–70004. Nevada challenged the Secretary's failure to terminate the site characterization activities, contending that the State had submitted a valid notice of disapproval and that current information disqualified the site. On February 2, 1990, a motions panel of this court ordered case No. 90–70004 consolidated with case No. 86–7308.

On February 28, 1990, the Secretary rejected the Governor's November 14, 1989 demand to terminate site characterization. The Secretary reassured the Governor that site characterization would terminate if investigation indicated that Yucca Mountain was unsuitable, but he reiterated that "only site characterization can produce the scientific data needed to determine whether or not the site is suitable."

On August 10, 1990, six days before oral argument in this consolidated appeal, the Attorney General of the State of Nevada submitted a letter to the Clerk of this court that states "that most of the constitutional arguments advanced by my office are either not ripe for adjudication, not germane to the issues properly before the Court in these matters, or not well taken in the context of these particular cases." The Attorney General advised the Clerk that he did not intend "to pursue in argument" these constitutional issues. On the same date, the Secretary also submitted a letter to the Clerk in which he opposed the withdrawal of any of the constitutional issues before this court because "[m]any of the

same arguments that General McKay now seeks to withdraw from resolution are also pending in related litigation before District Judge McKibben wherein the state is the defendant and Secretary Watkins is the plaintiff." We do not construe the Attorney General's letter to the Clerk as a motion to strike or withdraw his constitutional claims. Accordingly, we shall determine the merits of each contention asserted by the State of Nevada in its briefs.

## JURISDICTION

■ We have jurisdiction over these consolidated petitions for review pursuant to 42 U.S.C. § 10139(a)(1). Section 10139(a)(1) provides, in pertinent part:

(1) Except for review in the Supreme Court of the United States, the United States courts of appeals shall have original and exclusive jurisdiction over any civil action—

(A) for review of any final decision or action of the Secretary, the President, or the Commission under this part;

(B) alleging the failure of the Secretary, the President, or the Commission to make any decision, or take any action, required under this part;

(C) challenging the constitutionality of any decision made, or action taken, under any provision of this part. . . .

42 U.S.C. § 10139(a)(1)(A)–(C) (1982). A civil action for judicial review must be brought no later than the 180th day after the date of the decision or action or failure to act challenged in the action. *Id.* § 10139(c). The Secretary's challenged failure to act occurred on November 29, 1989. This petition was filed on January 5, 1990. Therefore, Nevada's petitions for review are timely.

## DISCUSSION

■ We review the Secretary's construction of the NWPA de novo, "in the context of the entire statutory scheme enacted by Congress to cope with the pressing problem of nuclear waste disposal." *Nevada v. Herrington,* 827 F.2d 1394, 1396 (9th Cir. 1987). We are mindful that "[a]lthough the judiciary is the final arbiter of issues of statutory construction, an administrative agency's interpretation of a statute it is charged with administering is accorded substantial deference." *Seldovia Native Ass'n v. Lujan,* 904 F.2d 1335, 1342 (9th Cir.1990).

## I. *Congress' Constitutional Authority to Enact the 1987 NWPA Amendments*

■ Nevada asserts that Congress did not have the constitutional authority to enact the 1987 amendments to the NWPA and, thus, the Secretary's decision to continue site characterization activities at Yucca Mountain is contrary to law. Congress, of course, possesses no power not derived from the Constitution. *Ex Parte Quirin,* 317 U.S. 1, 25, 63 S.Ct. 2, 9, 87 L.Ed. 3 (1942); *Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 326, 4 L.Ed. 97 (1816) ("The government, then, of the United States can claim no powers which are not granted to it by the Constitution, and the power actually granted, must be as such are expressly given, or given by necessary implication."). The Secretary points to three clauses that grant Congress the constitutional power to amend the NWPA: the Property Clause, U.S. Const. art. IV, § 3, cl. 2; the Commerce Clause, U.S. Const. art. I, § 8, cl. 3; and the Common Defense Clause, U.S. Const. art. I, § 8, cl. 1. Because the Property Clause provides a sufficient grant of constitutional authority to validate the 1987 amendments, we do not consider the other constitutional provisions relied on by the Secretary.

## A. *The Property Clause*

■ Pursuant to the Property Clause, "The Congress shall have power to dispose of and make all needful Rules and Regulations respecting the Territory or other property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. Under this clause, " ' "[t]he power over the public land thus entrusted to Congress is without limitations." ' " *California Coastal Comm'n v. Granite Rock Co.,* 480 U.S. 572, 580, 107 S.Ct. 1419, 1425, 94 L.Ed.2d 577 (1987) (quoting *Kleppe v. New Mexico,* 426 U.S. 529, 539, 96 S.Ct. 2285, 2291, 49 L.Ed.2d 34

(1976) (quoting *United States v. San Francisco*, 310 U.S. 16, 29, 60 S.Ct. 749, 756, 84 L.Ed. 1050 (1940))). Thus, it is well-established that "Congress exercises the powers both of a proprietor and of a legislature over the public domain." *Kleppe v. New Mexico*, 426 U.S. 529, 540, 96 S.Ct. 2285, 2292, 49 L.Ed.2d 34 (1976). Consistent with these powers, Congress may control the occupancy and use of the public lands. *Utah Power & Light Co. v. United States*, 243 U.S. 389, 405, 37 S.Ct. 387, 389, 61 L.Ed. 791 (1917), protect the public from hazardous conditions on those lands, *Camfield v. United States*, 167 U.S. 518, 525, 17 S.Ct. 864, 867, 42 L.Ed. 260 (1897), and regulate wildlife on those lands. *Kleppe v. New Mexico*, 426 U.S. at 540–41, 96 S.Ct. at 2292.

▮ Nevada contends that, because the Property Clause is not a power of Congress enumerated in Article I, that clause cannot serve as a textual basis for Congress' power to enact the 1987 amendments. We considered a similar argument in *United States v. Vogler*, 859 F.2d 638 (9th Cir. 1988), *cert. denied*, 488 U.S. 1006, 109 S.Ct. 787, 102 L.Ed.2d 779 (1989). In *Vogler*, a placer miner contended that the federal government could regulate land within a state only to further one of the enumerated powers granted to Congress in Article I, section 8, and thus had no authority to require him to obtain a federal access permit before mining in a national park. *Id.* at 640–41. We rejected that argument as "contrary to well-settled Supreme Court precedent establishing the broad power granted to the government in the property clause to regulate federal lands." *Id.* at 641. Thus, it was not necessary that Congress act pursuant to an enumerated power. *Id.*

The cases relied on by Nevada are not contrary to *Vogler*. In *Colorado v. Toll*, 268 U.S. 228, 45 S.Ct. 505, 69 L.Ed. 927 (1925), the Secretary of the Interior asserted exclusive jurisdiction to regulate the use of the state highways in Rocky Mountain National Park. *Id.* at 231, 45 S.Ct. at 506. These lands were owned by the State prior to the creation of the park. The statute creating the park specifically excluded state-owned lands from its provisions. *Id.* at 230, 45 S.Ct. at 506. As a result, the Court concluded that the federal government could not assert that it had exclusive jurisdiction to regulate those lands, because "the State has not surrendered its legislative power." *Id.* at 231, 45 S.Ct. at 506.

*Kansas v. Colorado*, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956 (1907), also involved an attempt by the federal government to regulate state-owned land. In that case, the Court rejected an argument by the United States that it had a right to intervene in a suit between Kansas and Colorado over the flow of the Arkansas River in order to enforce the Reclamation Act, which established a national program to irrigate arid lands. *Id.* at 87, 27 S.Ct. at 663. The Court considered both the Commerce Clause and the Property Clause as possible sources of power authorizing Congress to pass the Act. The government conceded that the Commerce Clause was inapplicable, because the Arkansas River was nonnavigable at the affected points. *Id.* The Court then concluded that the Property Clause was inapplicable, because that clause was "limited to authority over the property belonging to the United States within [the States'] limits" and did not apply to state-owned river beds. *Id.* at 89, 93, 27 S.Ct. at 664, 665. As a result, the United States could not intervene to enforce the Reclamation Act. *Id.* at 93–94, 27 S.Ct. at 665–66.

These consolidated petitions for review do not involve state-owned land. Yucca Mountain is federally owned land, subject to Congress' plenary power to regulate its use. Thus, the Property Clause provides a sufficient textual basis for Congress' authority to enact the 1987 NWPA amendments.

**B.** *Constitutional Limitations on Congress' Authority to Enact the 1987 NWPA Amendments*

The powers granted to Congress to legislate in specific areas "are always subject to the limitation that they may not be exer-

cised in a way that violates other specific provisions of the Constitution." *Williams v. Rhodes,* 393 U.S. 23, 29, 89 S.Ct. 5, 9, 21 L.Ed.2d 24 (1968). Nevada contends that a number of constitutional provisions restrict Congress' authority to enact the 1987 NWPA Amendments.

### 1. The Federal Enclave Clause

Nevada argues that the Federal Enclave Clause restricts Congress' authority to regulate federal land in Nevada because the state has not agreed to the cession of exclusive jurisdiction over the land to the federal government. The Federal Enclave Clause provides that

> The Congress shall have power ... To exercise exclusive legislation in all Cases whatsoever, over such District (not exceeding ten miles square) as may, by Cession of particular states, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in Which the Same Shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings....

U.S. Const. art. I, § 8, cl. 17.

■ The State's consent or cession is not required when Congress acts pursuant to its plenary authority to regulate the public lands:

> [W]hile Congress can acquire exclusive or partial jurisdiction over lands within a State by the State's consent or cession, the presence or absence of such jurisdiction has nothing to do with Congress' powers under the Property Clause. Absent consent or cession a State undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause. And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause.

*Kleppe v. New Mexico,* 426 U.S. at 542–43, 96 S.Ct. at 2293 (citations omitted); *see also Utah Power & Light Co. v. United States,* 243 U.S. at 404, 37 S.Ct. at 388 ("True, for many purposes a State has civil and criminal jurisdiction over lands within its limits belonging to the United States, but this jurisdiction does not extend to any matter that is not consistent with full power in the United States to protect its lands, to control their use and to prescribe in what manner others may acquire rights in them."). As a result, the Federal Enclave Clause does not abrogate Congress' authority to enact the NWPA, or to direct the Secretary to characterize Yucca Mountain as the potential repository under the NWPA.

### 2. The Equal Footing Doctrine

■ Nevada contends that "[t]he Equal-Footing Doctrine protects an unconsenting state's governmental prerogative to refuse to provide a solution to the nuclear utilities disposal problems created by non-preempted legislative decisions of other states.... The Nevada legislature's refusal to accept *all* high-level radioactive waste is an exercise of the police power guaranteed to the states by the Equal-Footing Doctrine which has not and may not be preempted in a comparative sense or an absolute sense." Petitioners' Opening Brief at 29 (emphasis in original) (footnote omitted).

The equal footing doctrine ensures that each state shares "those attributes essential to its equality in dignity and power with other states." *Coyle v. Oklahoma,* 221 U.S. 559, 568, 31 S.Ct. 688, 690, 55 L.Ed. 853 (1911). The Supreme Court's broadest exposition of the equal footing doctrine is found in *United States v. Texas,* 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221 (1950):

> The "equal footing clause" has long been held to refer to political rights and to sovereignty. It does not, of course, include economic stature or standing. There has never been equality among the States in that sense. Some States when they entered the Union had within their boundaries tracts of land belonging to the Federal Government; others were sovereigns of their soil. Some had special agreements with the Federal Government governing property within their

borders. Area, location, geology, and latitude have created great diversity in the economic aspects of the several States. The requirement of equal footing was designed not to wipe out those diversities but to create parity as respects political standing and sovereignty. *Id.* at 716, 70 S.Ct. at 922. Thus, "[t]he Federal Government ... cannot dispose of a right possessed by the State under the equal-footing doctrine of the United States Constitution." *Summa Corp. v. California,* 466 U.S. 198, 205, 104 S.Ct. 1751, 1755, 80 L.Ed.2d 237 (1984). The doctrine has been primarily applied to ensure that each State takes title to the beds of all navigable waters in that State, as did the original thirteen States that formed the Union. *See, e.g., Phillips Petroleum Co. v. Mississippi,* 484 U.S. 469, 476, 108 S.Ct. 791, 795, 98 L.Ed.2d 877 (1988) ("[T]he States, upon entry into the Union, received ownership of all lands under waters subject to the ebb and flow of the tide."); *accord Pollard's Lessee v. Hagan,* 44 U.S. (3 How.) 212, 228–29, 11 L.Ed. 565 (1845).

The equal footing doctrine, however, "negatives any implied, special limitation of any of the paramount powers of the United States in favor of a State." *United States v. Texas,* 339 U.S. at 717, 70 S.Ct. at 923. The States may only "exert that residuum of sovereignty not delegated to the United States by the Constitution itself." *Coyle v. Oklahoma,* 221 U.S. at 567, 31 S.Ct. at 690. Thus, for example, the title to lands underlying navigable waters may pass to the States "as incident to the transfer to the State of local sovereignty," but that title is still "subject ... to the paramount power of the United States to control such waters for purposes of navigation in interstate and foreign commerce." *United States v. Oregon,* 295 U.S. 1, 14, 55 S.Ct. 610, 615, 79 L.Ed. 1267 (1935). Thus, the equal footing doctrine is not a restriction on Congress' power to enact regulations concerning the siting of a national nuclear waste repository pursuant to the Property Clause. That power is delegated to Congress by the Constitution.

### 3. *The Privileges and Immunities Clause*

Nevada contends that the Article IV Privileges and Immunities Clause "protect[s] the privileges and immunities of states as political communities of citizens." Petitioners' Opening Brief at 33. Nevada argues that permitting "forty-nine of the republic's members, acting under the pretext of the Supremacy Clause, to destroy the economy or environment of its politically weakest member" would "deprive a state and the citizens of such state of the privileges and immunities of national citizenship and membership." Petitioners' Opening Brief at 34.

The Privileges and Immunities Clause provides that "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1. The clause was intended " 'to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned.' " *Supreme Court v. Friedman,* 487 U.S. 59, 64, 108 S.Ct. 2260, 2264, 101 L.Ed.2d 56 (1988) (quoting *Paul v. Virginia,* 75 U.S. (8 Wall.) 168, 180, 19 L.Ed. 357 (1869)). The clause " 'was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy.' " *Id.* (quoting *Toomer v. Witsell,* 334 U.S. 385, 395, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948) (footnote omitted)); *see also Hague v. Committee for Indus. Org.,* 307 U.S. 496, 511, 59 S.Ct. 954, 962, 83 L.Ed. 1423 (1939) (The clause prevents "a State from discriminating against citizens of other States in favor of its own." (footnote omitted)). Thus, the Privileges and Immunities Clause has been construed as a limitation on the powers of the States, not on the powers of the federal government. *Hawes v. Club Ecuestre El Commandante,* 535 F.2d 140, 145 (1st Cir.1976); *accord Maynard v. United States Dist. Court,* 701 F.Supp. 738, 740 (C.D.Cal.1988); *see generally* Note, *Membership Has Its Privileges and Immunities,* 102 Harv.L.Rev. 1925 (1989) (arguing that the Article IV Privileges and Immunities clause should be a

source of congressional power to protect rights of national citizenship against private interference). Nevada's construction of the Privileges and Immunities Clause is erroneous.

### 4. The Tenth Amendment

Nevada maintains that its rights under the tenth amendment were violated by the manner in which the 1987 NWPA amendments were enacted. Nevada asserts that "[i]t is undoubtedly a defect of the variety contemplated by the U.S. Supreme Court when powerful Senators and Congressmen get together in closed rooms without representation of the state affected and determine[ ] that a single-named state must accept a federal program shunned by all." Petitioners' Opening Brief at 43. Nevada argues that because Nevada was not represented on the House and Senate Conference Committee on the Omnibus Budget Reconciliation Act of 1987 when the 1987 NWPA amendments were approved, it was deprived of its " 'right to participate in the national political process' " and " 'was singled out in a way that left it politically isolated and powerless.' " Petitioners' Opening Brief at 40 (quoting *South Carolina v. Baker,* 485 U.S. 505, 512, 108 S.Ct. 1355, 1360, 99 L.Ed.2d 592 (1988)).

In making this argument, Nevada must confront the strictures of *South Carolina v. Baker,* 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988), and *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). As the Supreme Court pointed out in *South Carolina v. Baker,* "*Garcia* holds that the [tenth amendment limits on Congress' authority to regulate state activities] are structural, not substantive—i.e., that States must find their protection from congressional regulation through the nationally defined spheres of unregulable state activity." 485 U.S. at 512, 108 S.Ct. at 1360; *see also Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. at 552, 105 S.Ct. at 1018 ("State sovereign interests, then, are more properly protected by procedural safeguards inherent in the structure of the federal system than by judicially created limitations on federal power.").

In *Baker,* the Court noted that "*Garcia* left open the possibility that some extraordinary defects in the national political process might render congressional regulation of state activities invalid under the Tenth Amendment" but that the *Garcia* case did not "identify or define the defects that might lead to such invalidation." *South Carolina v. Baker,* 485 U.S. at 512, 108 S.Ct. at 1360. The Court also declined to do so in *Baker,* although it intimated that a state might be required to show that "it was deprived of any right to participate in the national political process or that it was singled out in a way that left it politically isolated and powerless." *Id.* at 513, 108 S.Ct. at 1361; *see also Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. at 554, 105 S.Ct. at 1019 ("[T]he fundamental limitation that the constitutional scheme imposes on the Commerce Clause to protect the 'States as States' is one of process rather than one of result. Any substantive restraint on the exercise of Commerce Clause powers must find its justification in the procedural nature of this basic limitation, and it must be tailored to compensate for possible failings in the national political process rather than to dictate a 'sacred province of state autonomy.' " (quoting *EEOC v. Wyoming,* 460 U.S. 226, 236, 103 S.Ct. 1054, 1060, 75 L.Ed.2d 18 (1983))). Whether such a showing is possible is unclear; commentators have read *Baker* as "unequivocally repudiating the suggestion that the tenth amendment requires any substantive or qualitative analysis of the national political process." *The Supreme Court, 1987 Term—Leading Cases,* 102 Harv.L.Rev. 143, 228 (1988).

██ Nevada cannot point to any defect in the political process that led to the enactment of the 1987 NWPA amendments. As the Secretary points out, the tenth amendment does not protect a State from being outvoted in Congress. Nevada's relative lack of political strength is a result of the "Great Compromise" of the 1787 Constitutional Convention, in which each State was guaranteed equal representation in the

Senate and proportionate representation in the House of Representatives. *Wesberry v. Sanders,* 376 U.S. 1, 9–14, 84 S.Ct. 526, 530–33, 11 L.Ed.2d 481 (1964) (citing 3 *The Records of the Federal Convention of 1787* 14 (M. Farrand ed. 1911)); *see also Bode v. National Democratic Party,* 452 F.2d 1302, 1307–08 (D.C.Cir.1971) ("The compromise met the objections of the less populous states to a distribution of national political power solely on a population basis notwithstanding the federated character of the new nation, formed of sovereign States."), *cert. denied,* 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972).

 Nor can Nevada complain that its lack of representation on the Conference Committee created a defect in the political process. The membership of the Conference Committee was established pursuant to Article I, section 5, clause 2, which, in pertinent part, states that "Each House may determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2; *see Vander Jagt v. O'Neill,* 699 F.2d 1166, 1172 (D.C.Cir.1982) (committee membership is a power allocated to each House of Congress pursuant to Art. I, § 5, cl. 2), *cert. denied,* 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983). To the extent that Nevada contends it should have had a representative on the committee, that issue is not justiciable. *Cf. Davids v. Akers,* 549 F.2d 120, 123–25 (9th Cir.1977) (membership on state legislative committees is not a justiciable controversy). To the extent that Nevada asserts that lack of representation created a defect in the political process as contemplated by *South Carolina v. Baker,* it cannot succeed in light of the plenary consideration given to the Omnibus Budget Reconciliation Act of 1987. *Cf. EEOC v. Vermont,* 904 F.2d 794, 802 (2d Cir.1990) ("In any event, the absence of a given legislator or legislators, so long as the legislative body's appropriate procedural rules have been followed, does not mean that the national process leading to the enactment of a given piece of legislation was flawed.").

 Nevada's other arguments on this issue have little merit. Nevada does not explain why the fact that the 1987 NWPA amendments were part of an appropriations bill is objectionable. When Congress desires to modify an existing statute, " '[t]here can be no doubt that ... it could accomplish its purpose by an amendment to an appropriation bill, or otherwise.' " *United States v. Will,* 449 U.S. 200, 222, 101 S.Ct. 471, 484, 66 L.Ed.2d 392 (1980) (quoting *United States v. Dickerson,* 310 U.S. 554, 555, 60 S.Ct. 1034, 1035, 84 L.Ed. 1356 (1940)). Furthermore, Nevada's argument that the 1987 amendments were enacted in violation of the Bicameralism and Presentment Clause, U.S. Const. art. I, § 7, cl. 1, is unpersuasive in view of the fact that it does not dispute the Secretary's contention that the Omnibus Budget Reconciliation Act of 1987 was passed in accordance with those provisions. Finally, we find it difficult to accept Nevada's argument that the enactment of the 1987 NWPA amendments constituted a failure in the political process in light of the fact that the NWPA contains a mechanism for Nevada to register its disapproval of a repository siting decision. *See* 42 U.S.C. § 10136(b). Thus, the tenth amendment does not limit Congress' authority to enact the 1987 NWPA amendments.

5. *The Port Preference Clause*

Nevada contends that Congress' enactment of the 1987 NWPA amendments violated the Port Preference Clause of Article I. Nevada asserts that "[i]n effect, the NWPA has created a preference for worldwide tourists in states other than Nevada because Nevada will be saddled with a nuclear waste induced stigma if the repository program reaches fruition through the site characterization program. That stigma may dissuade tourists from selecting Las Vegas and cause them to prefer other destinations over Las Vegas." Petitioners' Opening Brief at 47.

 The Port Preference Clause provides that "No preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another." U.S. Const. art. I, § 9, cl. 6. The clause " 'prevent[s] preference as be-

tween States in respect of their ports or the entry and clearance of vessels.'" *Alabama Great S. R.R. Co. v. United States*, 340 U.S. 216, 229, 71 S.Ct. 264, 273, 95 L.Ed. 225 (1951) (quoting *Louisiana Public Serv. Comm'n v. Texas & N.O. R.R. Co.*, 284 U.S. 125, 131, 52 S.Ct. 74, 76, 76 L.Ed. 201 (1931)). As the Secretary points out, although the Port Preference Clause is a positive limitation on congressional authority, the clause does not prohibit legislation that "incidentally result[s] to the disadvantage of other ports in the same or neighboring States." *Id.* (quoting *Louisiana Public Serv. Comm'n v. Texas & N.O. R.R. Co.*, 284 U.S. at 131, 52 S.Ct. 76); *see also South Carolina v. Georgia*, 93 U.S. (3 Otto) 4, 13, 23 L.Ed. 782 (1876) ("[T]he prohibition of such a preference does not extend to acts which may directly benefit the ports of one state and only incidentally injuriously affect those of another...."); *accord Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 433–35, 15 L.Ed. 435 (1856). Thus, legislative enactments do not offend the Port Preference Clause "even if they result in some detriment to the port of a state, where they occur ... as an incident to some otherwise legitimate government act regulating commerce." *City of Houston v. FAA*, 679 F.2d 1184, 1197 (5th Cir.1982). Assuming, arguendo, that site characterization of Yucca Mountain will be detrimental to Nevada's tourist industry, such an effect is merely an incident to a valid congressional enactment.

We conclude that Congress' authority to enact the 1987 NWPA amendments pursuant to the Property Clause is not limited by any other provision of the Constitution.

## II. *The Effectiveness of Nevada's Notice of Disapproval*

Nevada contends that the submission of Assembly Joint Resolutions 4 and 6 constituted a valid notice of disapproval that took effect because Congress failed to enact a joint resolution overriding the notice within 90 days, pursuant to 42 U.S.C. § 10135(c). Nevada argues that the Secretary's pursuit of site characterization in the face of the notice of disapproval is arbitrary and capricious. Nevada first contends that the timing provisions of the NWPA that govern the submission of a notice of disapproval are unconstitutional. Secondly, it is asserted that Nevada may submit a notice of disapproval *prior* to the President's recommendation of a repository to Congress, pursuant to 42 U.S.C. § 10134(2)(A). Neither contention has merit.

### A. *The Guarantee Clause*

▮▮▮▮▮▮ Nevada contends that the provisions of the NWPA that govern the timing of the State's submission of a notice of disapproval violate the Guarantee Clause, U.S. Const. art. IV, § 4. Section 10136(b) provides that

> Unless otherwise provided by State law, the Governor or legislature of each State shall have authority to submit a notice of disapproval to the Congress under paragraph (2). In any case in which State law provides for submission of any such notice of disapproval by any other person or entity, any reference in this part to the Governor or legislature of such State shall be considered to refer to such other person or entity.

42 U.S.C. § 10136(b)(1) (1982). Paragraph (2) permits "[s]uch Governor or legislature [to] submit such a notice of disapproval to the Congress not later than the 60 days after the date that the President recommends such site to the Congress under section 10134 of this title." *Id.* § 10136(b)(2).

The Nevada legislature meets on a biennial basis for approximately five to six months. Nev. Const. art. 4, § 2. Because of this schedule, Nevada asserts that the Secretary and the President may time the recommendation of Yucca Mountain as the repository site at a time when the legislature is not in session. The Governor may then refuse to call a special session of the legislature, pursuant to Nev. Const., art. 5, § 9, and then decline to submit a notice of disapproval. By doing so, the Secretary and the President will deprive the citizens of Nevada of the "Republican Form of Government" guaranteed by Article IV, section 4 of the Constitution "because their

representatives in the Legislature may be deprived of the opportunity to vote on the measure at the Governor's option." Petitioners' Opening Brief at 51.

As the Secretary notes, this claim is wholly speculative. The President has not yet recommended Yucca Mountain to Congress for selection as the nuclear waste repository. Furthermore, challenges to legislation based on the Guarantee Clause are not justiciable. *City of Rome v. United States*, 446 U.S. 156, 182 n. 17, 100 S.Ct. 1548, 1564 n. 17, 64 L.Ed.2d 119 (1980); *Baker v. Carr*, 369 U.S. 186, 228–29, 82 S.Ct. 691, 715–16, 7 L.Ed.2d 663 (1962).

B. *Compliance with Section 10136*

Nevada argues that the 1987 NWPA amendments designated Yucca Mountain as the repository site and, "therefore, there was a repeal by implication of any necessity to await a *pro forma* recommendation by the President. At that time, jeopardy immediately attached to Yucca Mountain and the question of the State's approval or disapproval was ripe." Petitioners' Opening Brief at 54 n. 22.

■■■ "[R]epeals by implication are not favored, and will not be found unless an intent to repeal is 'clear and manifest.'" *Rodriguez v. United States*, 480 U.S. 522, 524, 107 S.Ct. 1391, 1392, 94 L.Ed.2d 533 (1987) (per curiam). (citations omitted). An intent to repeal can only be inferred from the existence of an "irreconcilable conflict" between an amendment and a statutory provision. *Id.* There is no such "irreconcilable conflict" between the 1987 NWPA amendments and section 10136(b)'s requirement that the President recommend the site for selection prior to Nevada's submission of a notice of disapproval. Instead, the provisions "fit together quite sensibly." *Id.*

Section 10136(b) specifically ties the timing of a state notice of disapproval to the President's recommendation to Congress. *See* 42 U.S.C. § 10136(b)(2) ("Upon submission by the President to the Congress of a recommendation of a site for a repository, the Governor or legislature of the State in which such site is located may disapprove the site designation and submit to the Congress a notice of disapproval."). The President's recommendation to Congress is governed by section 10134. Pursuant to section 10134(a)(3), "[t]he President may not recommend the approval of the Yucca Mountain site unless the Secretary has recommended to the President under paragraph (1) approval of such site and has submitted to the President a statement from such site as required under such paragraph." *Id.* § 10134(a)(3)(A) (Supp. V 1987).

Paragraph (1) of section 10134 requires the Secretary to "hold public hearings in the vicinity of the Yucca Mountain site, for the purposes of informing the residents of the area of such consideration and receiving their comments regarding the possible recommendation of such site." *Id.* § 10134(a)(1). If, upon completion of the hearings and completion of the site characterization activities at the Yucca Mountain site pursuant to 42 U.S.C. § 10133, the Secretary decides to recommend approval of the site to the President, the Secretary must notify the Governor and legislature of Nevada. *Id.* Section 10134 also requires the preparation of an environmental impact statement to accompany the Secretary's recommendation to the President. *Id.* § 10134(f).

An extensive amount of study, deliberation, and debate must take place before the President can make a recommendation to Congress regarding his site selection. The fact that Congress amended the NWPA to make Yucca Mountain the only site to be characterized does not nullify the steps preceding the President's recommendation. Thus, the provisions do not "irreconciliably conflict," and there has been no implied repeal of recommendation as a prerequisite to Nevada's notice of disapproval. Because Nevada did not comply with section 10136(b), its notice of disapproval is ineffective under the plain language of the NWPA.

■■ In its reply brief, Nevada raises for the first time the argument that 42 U.S.C. § 10247(c)(2)(B) constitutes a selec-

tion of Yucca Mountain as the repository site. Petitioners' Reply Brief at 2, 33. Section 10247(c)(2)(B) was enacted by Congress as part of the Omnibus Budget Reconciliation Act of 1987. As a result, Nevada had the opportunity to raise this issue in its opening brief. Consideration of this argument would be unfair to the Secretary, who has not had the advantage of briefing the issue. In declining to consider this argument, we follow " '[t]he general rule ... that appellants cannot raise a new issue for the first time in their reply briefs.' " *United States v. Birtle*, 792 F.2d 846, 848 (9th Cir.1986) (quoting *Thompson v. Commissioner*, 631 F.2d 642, 649 (9th Cir.1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981)).

## C. Nevada's Attempted Legislative Veto of Site Characterization

 Section 459.910 of the Nevada Revised Statutes provides that "[i]t is unlawful for any person or governmental entity to store high-level radioactive waste in Nevada." Nev.Rev.Stat. § 459.910(1) (1989). "High-level radioactive waste" is defined by reference to 10 C.F.R. § 60.2. *Id.* § 459.910(2); *see* 10 C.F.R. § 60.2 (1990) (defining "high-level radioactive waste" as "(1) Irradiated reactor fuel, (2) liquid wastes resulting from the operation of the first cycle solvent extraction system, or equivalent, and the concentrated wastes from subsequent extracting cycles, or equivalent, in a facility for reprocessing irradiated reactor fuel, and (3) solids into which such liquid wastes have been converted."). Nevada contends that section 459.910 and Assembly Joint Resolutions 4 and 6 are the substantial equivalent of a legislative veto of the Secretary's site characterization activities. Accordingly, it is argued, the Secretary's decision to continue site characterization in the face of Nevada's legislative veto is arbitrary and capricious. The Secretary maintains that the NWPA preempts section 459.910 to the extent that it is inconsistent with the Act.

Neither party contends that Congress has expressly preempted the field of nuclear waste disposal. Under the Supreme Court's preemption analysis, when Congress does not "define explicitly the extent to which its enactments pre-empt state law," *English v. General Elec. Co.*, 110 S.Ct. at 2275,

> "[S]tate law can be pre-empted in either of two general ways. If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted.... If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law ... or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."

*California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. at 581, 107 S.Ct. at 1425 (quoting *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 247, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984)).

Whether Nevada's legislative veto is preempted under the first criterion is unclear. In its decisions considering the preemptive effect of the Atomic Energy Act, 42 U.S.C. §§ 2011–2284 (1982 & Supp. V 1987), the Supreme Court has concluded that " 'the Federal Government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the States.' " *English v. General Elec. Co.*, 110 S.Ct. at 2277 (quoting *Pacific Gas & Elec. Co. v. State Energy Resources & Dev. Comm'n*, 461 U.S. 190, 212 & n. 25, 103 S.Ct. 1713, 1726–27 & n. 25, 75 L.Ed.2d 752 (1983)) (state-law tort claim for intentional infliction of emotional distress was not preempted by federal law); *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 258, 104 S.Ct. 615, 626, 78 L.Ed.2d 443 (1989) (state-law tort claim for punitive damages was not preempted by federal law); *Pacific Gas & Elec. Co. v. State Energy Resources & Dev. Comm'n*, 461 U.S. 190, 216, 103 S.Ct. 1713, 1728, 75 L.Ed.2d 752 (1983) (California statute that conditioned the construction of a nuclear power plant on a state agency's approval of the plant's nuclear waste storage and disposal facilities was not preempted by feder-

al law because it was motivated by economic concerns). The Court has not yet confronted the issue whether the NWPA "occupies the field" of nuclear waste disposal.

At this juncture, it is not necessary for us to resolve this issue. Nevada's attempted legislative veto of the Secretary's site characterization activities " 'stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.' " *California Coastal Comm'n v. Granite Rock Co.,* 480 U.S. at 581, 107 S.Ct. at 1425 (quoting *Silkwood v. Kerr–McGee Corp.,* 464 U.S. at 248, 104 S.Ct. at 621). Congress clearly directed the Secretary to continue site characterization activities at Yucca Mountain in the 1987 amendments to the NWPA. *See* 42 U.S.C. § 10133(a) (Supp. V 1987) ("The Secretary shall carry out, in accordance with the provisions of this section, appropriate site characterization activities at the Yucca Mountain site."). "[A]ny state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause." *Perez v. Campbell,* 402 U.S. 637, 652, 91 S.Ct. 1704, 1712, 29 L.Ed.2d 233 (1971). We hold that Nevada's attempted legislative veto of the Secretary's site characterization activities is preempted by the NWPA.

Nevada argues that, because its legislative veto is premised on economic and environmental concerns, its action falls within the police powers reserved to the states and is not preempted. Nevada relies on *Pacific Gas & Electric Co. v. State Energy Resources & Development Commission,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), to support this argument. In that case, the Court concluded that the state law being challenged was not preempted by the federal laws regulating nuclear safety because it was motivated by economic concerns. *Id.* at 216, 103 S.Ct. at 1728. More recently, however, the Supreme Court has clarified *Pacific Gas & Electric,* noting that although "part of the pre-empted field is defined by reference to the purpose of the state law in question, ... another part of the field is defined by the state law's actual effect on nuclear safety." *English v. General Elec. Co.,* 110 S.Ct. at 2278.

"[F]ield pre-emption may be understood as a species of conflict pre-emption." *Id.* at 2275. Although the professed motivation for Nevada's legislative veto is the economic and environmental effects of nuclear waste disposal, the state's action has the actual effect of frustrating Congress' intent. Thus, the attempted legislative veto is preempted by the 1987 NWPA amendments.

### III. The Secretary's Site Disqualification Process

Nevada contends that the Secretary "must have a methodology, some formalized system of data collection, evaluation and decision making, to determine, *early and throughout* the process, whether or not *any* Disqualifying Conditions exist, and if so, for making the required decision to terminate work at the site *whenever* such a condition is found." Petitioners' Opening Brief at 67 (emphasis in original). Nevada further asserts that sufficient information now exists that compels the conclusion that Yucca Mountain is unsuitable for development as a repository and, therefore, must be disqualified as a potential site. Petitioners' Opening Brief at 72. The Secretary argues that his site characterization methodology is not subject to judicial review under the provisions of either the NWPA or the Administrative Procedure Act.

The NWPA provides for judicial review of "the failure of the Secretary ... [to] take any action, required under [the NWPA]." 42 U.S.C. § 10139(a)(1)(B). An examination of the NWPA and the regulations governing site disqualification leads to the conclusion that promulgation of regulations governing the timing of a site disqualification decision is not required under the NWPA.

Pursuant to section 10133, the Secretary has the authority to carry out "appropriate site characterization activities at the Yucca Mountain site." *Id.* § 10133(a). Section 10133 also requires the Secretary to establish criteria to be used to determine the suitability of Yucca Mountain for the location of a repository:

(1) Before proceeding to sink shafts at the Yucca Mountain site, the Secretary shall submit for such candidate site to the Commission and to the Governor or legislature of the State of Nevada, for their review and comment—

(A) a general plan for site characterization activities to be conducted at such candidate site, which plan shall include—

. . . .

(iv) criteria to be used to determine the suitability of such candidate site for the location of a repository, developed pursuant to section 10132(a) of this title. . . .

*Id.* § 10133(b)(1) (1982 & Supp. V 1987). Section 10132(a) sets forth the Secretary's duty to issue guidelines for the recommendation of sites for repositories. After the NWPA was amended in 1987, section 10132(a) was retained unchanged. *See id.* § 10132(a) (Supp. V 1987). As amended section 10133(b), quoted above, makes clear, the guidelines developed by the Secretary pursuant to section 10132(a) are to be utilized to determine the suitability of Yucca Mountain for the location of the repository. *Id.* § 10133(b)(1)(A)(iv). Section 10132(a) provides, in pertinent part, that

Such guidelines shall specify detailed geologic considerations that shall be primary criteria for the selection of sites in various geologic media. Such guidelines shall specify factors that qualify or disqualify any site from development as a repository, including factors pertaining to the location of valuable natural resources, hydrology, geophysics, seismic activity, and atomic energy defense activities, proximity to water supplies, proximity to populations, the effect upon the rights of users of water, and proximity to components of the National Park System, the National Wildlife Refuge System, the National Wild and Scenic Rivers System, the National Wilderness Preservation System, or National Forest Lands. Such guidelines shall take into consideration the proximity to sites where high-level radioactive waste and spent nuclear fuel is generated or temporarily stored and the transportation and safety factors involved in moving such waste to a re-

pository. Such guidelines shall specify population factors that will disqualify any site from development as a repository if any surface facility of such repository would be located (1) in a highly populated area; or (2) adjacent to an area 1 mile by 1 mile having a population of not less than 1,000 individuals. Such guidelines also shall require the Secretary to consider the cost and impact of transporting to the repository site the solidified high-level radioactive waste and spent fuel to be disposed of in the repository and the advantages of regional distribution in the siting of repositories. Such guidelines shall require the Secretary to consider the various geologic media in which sites for repositories may be located and, to the extent practicable, to recommend sites in different geologic media.

*Id.* § 10132(a) (1982). These guidelines are set forth at 10 C.F.R. §§ 960.3, 960.4 (1989).

Section 10133 sets forth the parameters of the Secretary's authority to carry out side characterization activities:

(1) The Secretary may conduct at the Yucca Mountain site only such site characterization activities as the Secretary considers necessary to provide the data required for evaluation of the suitability of such site for an application to be submitted to the Commission for a construction authorization for a repository at such site, and for compliance with the National Environmental Policy Act of 1969 (42 U.S.C. § 4321 et seq.).

(2) In conducting site characterization activities—

(A) the Secretary may not use any radioactive material at a site unless the commission concurs that such use is necessary to provide data for the preparation of the required environmental reports and an application for a construction authorization for a repository at such site; and

(B) if any radioactive material is used at a site—

(i) the Secretary shall use the minimum quantity necessary to determine

the suitability of such site for a repository, but in no event more than the curie equivalent of 10 metric tons of spent nuclear fuel; and

(ii) such radioactive material shall be fully retrievable.

42 U.S.C. § 10133(b).

▇▇ Nevada does not contend that the Secretary has failed to establish guidelines pursuant to section 10132(a). Instead, Nevada contends that the Secretary has a judicially enforceable duty to determine, throughout the site characterization process, whether any disqualifying conditions exist. The statutory scheme, however, does not create any right to judicial review of the Secretary's timing of site disqualification. To the contrary, the statute appears to commit the timing of the Secretary's decision regarding disqualifying conditions to his discretion. Section 10133(c) provides:

(3) *If the Secretary at any time determines* the Yucca Mountain site to be unsuitable for development as a repository, the Secretary shall—

(A) terminate all site characterization activities at such site;

(B) notify the Congress, the Governor and legislature of Nevada of such termination and the reasons for such termination;

(C) remove any high-level radioactive waste, spent nuclear fuel, or other radioactive materials at or in such site as promptly as practicable;

(D) take reasonable and necessary steps to reclaim the site and to mitigate any significant adverse environmental impacts caused by site characterization activities at such site;

(E) suspend all future benefits payments under part F of this subchapter with respect to such site; and

(F) report to Congress not later than 6 months after such determination the Secretary's recommendations for further action to assure the safe, permanent disposal of spent nuclear fuel and high-level radioactive waste, including the need for new legislative authority.

*Id.* § 10133(c) (emphasis added). Such a determination is considered "a preliminary decisionmaking activity" pursuant to section 10133(d).

The Department of Energy's regulations regarding site disqualification also protect the discretion granted to the Secretary in determining the timing of a site disqualification. 10 C.F.R. § 960.3–1–5 provides, in pertinent part, that "[a] site shall be disqualified at any time during the siting process if the evidence supports a finding by the DOE that a disqualifying condition exists or the qualifying condition of any system or technical guideline cannot be met." 10 C.F.R. § 960.3–1–5 (1989). The Secretary, of course, must make the evaluation that a disqualifying condition exists. Thus, this regulation supports the Secretary's exercise of discretion in timing a disqualification decision.

▇▇ Because the Secretary is not required to promulgate regulations governing the timing of a disqualification decision, judicial review of his decision not to do so is not available under section 10139(a). If a statute does not expressly provide for judicial review of an agency decision, judicial review is available within the constraints of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–706 (1988). *Clementson v. Brock,* 806 F.2d 1402, 1407 (9th Cir.1986). Under the APA, final agency action, including a failure to act, is subject to judicial review if there is no other adequate remedy in a court. 5 U.S.C. §§ 551(13), 704 (1988). "It is the imposition of an obligation or the fixing of a legal relationship that is the indicium of finality of the administrative process." *Getty Oil Co. v. Andrus,* 607 F.2d 253, 256 (9th Cir. 1979). Because site characterization does not create any legal obligation or relationship on the part of Nevada, it is doubtful whether the Secretary's failure to provide for the timing of his disqualification decisions has the requisite finality.

▇▇ Even assuming this failure to act is a final agency action, judicial review under the APA is precluded to the extent that "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (1988). "Such action is unreviewable, for there is simply 'no law to apply.' " *Clem-*

*entson v. Brock,* 806 F.2d at 1404 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971)). Under section 701(a)(2), "even when Congress has not affirmatively precluded judicial oversight, 'review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Webster v. Doe,* 486 U.S. 592, 599–600, 108 S.Ct. 2047, 2052, 100 L.Ed.2d 632 (1988) (quoting *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985)). The timing of a disqualification decision is committed to the Secretary's discretion by law. As a result, Nevada cannot contend that an early suitability decision is required based on the available evidence. The Secretary simply has not determined whether disqualifying conditions exist, preferring instead to pursue further study. This decision is not reviewable.

### CONCLUSION

The Secretary's decision to continue site characterization is not contrary to law. The Secretary has no judicially enforceable duty to promulgate regulations governing the timing of site disqualification decisions.

AFFIRMED.